State *vs.* Rankin.

---

HEARD APRIL TERM, 1872.

## STATE *vs.* RANKIN.

The Supreme Court cannot hear a motion in arrest of judgment, as an original motion. It must be made, in the first instance, in the Circuit Court.

To cause a whole neighborhood to become sickly, by erecting a dam across a stream, thus causing the water to stagnate and corrupt the air, is a public nuisance, for which an indictment lies.

So also, it is a public nuisance, and indictable, if the pond, without causing sickness, produces smells and stenches, which render the enjoyment of life and property in the community uncomfortable.

If a mill pond, which has existed for seventy years, becomes a public nuisance by corrupting the air, causing disagreeable smells and sickness, the owner may be indicted.

One is not guilty of a public nuisance unless the injurious consequences complained of are the natural, direct and proximate cause of his own acts. If such consequences are caused by the acts of others so operating on his acts as to produce the injurious consequences, then he is not liable.

BEFORE ORR, J., AT ANDERSON, JAN. TERM, 1872.

This was an indictment against George W. Rankin for a public nuisance.

The indictment contained three counts. The first charged that George W. Rankin, on the first day of January, in the year of our Lord one thousand eight hundred and seventy, at Anderson Court House, in the County and State aforesaid, injuriously and knowingly did erect, or cause to be erected, a certain dam across Three and Twenty Creek, a common and ancient water course at Anderson Court House, in the County and State aforesaid, by means of which the water flowing in the creek was stopped, dammed up and flowed back in and upon the surface of large tracts of adjoining lands, by means whereof the mud, wood, leaves, brush, and the animal and vegetable substances and other filth, collected and brought down the channel of said water course, by the natural flowing of the waters, there became and were, during all the time aforesaid, collected and accumulated in large quantities in the channel of said water course, and on the lands overflowed, as aforesaid, and the said mud, wood, leaves, brush, and the animal and vegetable substance, so there collected, as aforesaid, became, and were, and still are, offensive, and the waters became, and are, corrupted; and by means whereof divers nauseous, unwholesome and deleterious smells and stenches did arise, so that the air was, and still is, corrupted and infected to the great damage and common nuisance of the good and worthy citizens of this State, there passing and repassing, dwelling and inhabiting, and against the peace and dignity of the same State aforesaid.

The second count charged that George W. Rankin, being possessed of a certain mill dam at Anderson Court House, in the County and State aforesaid, with their appurtenances, situate near and adjacent to the dwelling houses of divers of the good citizens of this State, did on the first day of January, in the year of our Lord one thousand eight hundred and seventy , and on divers days before and since, unlawfully and injuriously permit the water of the mill pond to overflow the adjacent lands, as well of others as his own, by means whereof the land so overflowed was rendered and kept marshy, and filled and covered with noxious weeds and putrid vegetation, whereby the air became corrupted and infected, to the great damage and common nuisance of the good and worthy citizens of this State, there dwelling and inhabiting, and against the peace and dignity of the same State aforesaid.

And the third count charged that George W. Rankin, on the first day of January, in the year of our Lord one thousand eight hundred and seventy , at Anderson Court House, in

the County and State aforesaid, unlawfully and injuriously a certain and ancient water course, called Three and Twenty Creek, with earth, gravel and other materials, did obstruct, and stop up, by reason whereof the rains and waters that used to flow through the said water course, did overflow the adjacent lands and remain and became putrid, stagnant and noxious, and did send forth unwholesome and infectious damps, fogs 'and smells, whereby the air was greatly corrupted and infected, to the great damage of the health and the endangering the lives of the good citizens of the said State, there inhabiting and dwelling, and against the peace and dignity of the same State aforesaid.

The case on which the appeal was heard, is as follows:

The defendant was indicted for erecting and keeping a public nuisance, namely, a mill-dam and pond on Three and Twenty Creek, in Anderson County. The indictment contained three counts. The first charged that the defendant " did erect or cause to be erected a certain dam," &c.; the second charged that the defendant " being possessed of a certain mill-dam, &c., did permit the waters of the mill-pond to overflow the adjacent land," &c.; and the third charged that the defendant " unlawfully, a certain ancient water course with earth, gravel and other materials, did obstruct and stop up," &c. The defendant pleaded not guilty. The testimony showed very clearly a successive and continuous ownership, possession and use of the mill-dam, and valuable mills, for a period of over seventy years by the defendant's grandfather, his father and himself; that the pond of water was wholly upon the defendant's own land, and the head of the mill-pond, or .dammed water, was eighty rods distant from, and within, the defendant's line, crossing the stream above; the dam had always been of the same height, and located on the same site; it was renewed in 1859, and made a close dam; prior to the re-building it had become rotten and decayed, and leaked so that the water was wasted, and at times was insufficient to propel the machinery. It was urged before the jury, on this proof, that much of the sand and mud which came down the stream passed through the dam and escaped, prior to its being rebuilt, and that after the new dam was built there was no escape of the mud, gravel and sand coming down the stream, which caused an accumulation of debris at the head of the pond, and flooded and overflowed the bottom land above, and caused the "stenches, smells," and sickness above the head of the pond. In the opinion of witnesses, the quantity of

land covered by the water of the mill-pond was ten or fifteen acres, and had, probably, in the lapse of years, diminished; and that now, as heretofore, the water of the stream had a fall of about eighteen inches, and flowed in great part in the old channel, from the defendant's line above, to the head of his mill-pond. No dead timber immediately around the pond, but willows and swamp growth.

Three and Twenty Creek is formed by the junction of three streams, uniting at different points above the defendant's land, and varying in distance therefrom from a half to one mile. The creek is represented as creeping and sluggish below the dam, in its entire length, with few falls, and they of slight elevation. In A. D. 1860, the riparian proprietors, above the defendant's land, combining together, cut a ditch, beginning at a short distance above the defendant's line, and at a spot where a log for passing, known as the "foot log," crossed the creek. The ditch was commenced and sunk in the channel of the creek, to a depth of, perhaps, one foot below the old bed at the starting point; was ten feet in width, and extended in a straight line up the creek, without conforming to its windings, though occasionally sunk in the bed of the stream, for the distance of two miles or more, running up the different branches.

After the cutting of the ditch, the sand collected at its lower end, at the "foot-log," which is now covered by sand, and, in time, accumulated so that the channel, at the end of the ditch, in which the water had formerly flowed, became choked, and higher than the adjacent banks. The water was thus forced over the edges of the ditch, or banks, permeated the adjacent low grounds, and collected in spots in small holes, or pools. The entire descent of the water, from Conner's Bridge to the forks of the creek (a half mile,) was nearly nine feet; from the forks of the creek to "foot-log" (one-fourth of a mile,) from six inches to one foot; and from the "foot-log" to pond (one-fourth of a mile,) one to one and a half feet.

The low grounds adjacent to the ditch became wet (sobbed,) and unfit for cultivation. Gradually they were covered with vegetation; the timber upon the uncleared bottoms, on both sides of the ditch, died, fell and rotted upon the low grounds, and, at some spots, lay in the ditch. This condition of the low grounds extended up the creek, and smaller streams, far above the defendant's land, for a distance of two and a half miles, and within one-half mile of the residence of a party (Dr. Earle) whose family, and tenants residing on his place, and several families in the same neighborhood, adjacent

to the said stream, increasing annually for several years, were alleged to have been afflicted with malarial disease.

The defendant had no agency in cutting this ditch, nor in any way consented thereto. He refused permission to the proprietors of the lands above to extend the ditch through his own land—the eighty rods lying between his line, and the eddy water of the pond—giving as his reason for the refusal, it would " fill his mill-pond with sand."

It was in proof that the proprietors above, before cutting the ditch, consulted men of scientific knowledge of such matters, and were informed the ditch would not accomplish their purpose, nor drain the low grounds. They acted, however, against this opinion, and cut the ditch.

The charge by the State against the defendant was, that the mill-dam had been a nuisance, inasmuch as it caused the flooding of the lands, the dying of the timber, and the accumulation of stagnant water, and putrid vegetable substances above, which caused malarial diseases.

There was much testimony upon the subject of malaria, and its qualities. The opinion of the physicians was uniform that its body or substance had never been detected by the senses; and that its existence was known and recognized only from effects and results. Some of the medical witnesses denied its existence, but the majority of them approved the theory of its existence, and those of them who were acquainted with the locality and condition of the low grounds testified they exhibited the elements that generate malaria.

Two or three of them testified that there was sufficient cause for malaria in the condition of the low grounds, near the house of Dr. Earle, three miles from the mill of defendant, where, it was alleged, much sickness had existed, and that the condition of the low grounds resulted indirectly from the obstruction of the stream by defendant's mill dam.

All agreed that the mill pond proper, being of long standing, with water covering the bed, would not produce disease, as would the low grounds, with their alterations of dryness and moisture, and decaying vegetable substances.

The physicians, generally, testified that the chills and fever, and bilious remittent fever, which prevailed around the mill pond and low grounds, and near the three streams forming the creek, might, according to theory, be attributed to the unhealthy condition of the low grounds.

Until 1860, disease, in that neighborhood, had not attract-ed notice; indeed, up to that time, the neighborhood, called "Slabtown," was famed for its health. After that time, occasional cases of chills and fever, and bilious remittent fever occurred, and, some witnesses believed, such cases had increased in numbers.

The large number of cases was in 1871, when a majority of persons in the vicinity of the low grounds were seized with dis-eases, alleged to be of malarial type. A number of families and persons, equally exposed to fever, escaped. And it was noticeable that the great amount of sickness was not near the pond, but in the locality of, and above, the low grounds, one or two miles up.

It was also in proof, as connected with the above, that disease of malarial character was more generally prevalent in 1871, than it had been ever known before, and was found to invade places which before had been wholly exempt from it, and where it could not be traced to any known local cause.

The State charged that the condition of the low grounds resulted directly or consequentially from the defendant's mill pond and dam below ; that the mill dam was the cause of the dead timber, the wet and sobbed state of the land, and of the vegetation annually grow-ing and decaying, which afforded the constituents by which mala-ria, producing disease, was generated. It was affirmed that this malaria affected the people with the various kinds of fever, and be-ing, as alleged, traced to the mill dam, as primary cause, consti-tuted the mill dam and pond a common or public nuisance.

The defendant, in reply, alleged that the condition of the low grounds was occasioned by the conduct of the prosecutor, and his co-actors, in cutting the ditch ; that until the ditch was dug, the lands adjacent to the creek was not wet and sobbed, nor had the timber thereon died ; that the fall and flow of water between the lower end of the ditch and the head of the mill pond precluded the assumption that the mill dam, or water in the pond, had any agency in producing the condition of the low grounds above ; that at the most—if there was any agency—it was very remote ; and that if the prosecutor and his co-actors suffered damage, it resulted from the consequences of their own act, either alone or in connection with the natural filling of the stream above, from the cultivation of the country.

On the part of the defendant, the following points were presented to the Court as questions of law :

1st. That no indictment will lie, as the offence, if any, is a pri-

vate, and not a public nuisance; and if there be parties injured, their remedy is by action of law.

2d. That the third count of the indictment is vague and indefinite as to time and locality, especially the latter, and should be stricken from the indictment.

3d. That the evidence of sickness and disease should not be considered by the jury, inasmuch as there are no such allegations in the indictment, nor allegations connecting disease and sickness with " noxious air, unwholesome smells," &c., and the only proof to be considered, should refer to the allegations of the indictment.

The Court refused to rule as requested, or to sustain any of the points made, and sent the case to the jury.

On the part of the defendant, the Court was then requested to charge the jury upon the following points :

1st. " That repairing the old dam, and erecting a new one on the same foundation, and continued use, was the same as if it had been one dam all the while, provided the new dam is no higher than the old, and the water level is not raised."

2d. That the defendant, besides being the owner of the land on which the pond rests, is entitled to the benefit of at least *seventy years' user*, which gives him all the rights relating to property that either the State or individuals can give.

3d. That this long possession and user, whilst it does not absolutely protect him from an indictment for nuisance at the suit of the State, entitles him to an acquittal, unless the jury should be clearly of opinion that the mill pond is the "*natural and proximate cause* of the smells and stenches " complained of.

4th. That the defendant should be acquitted, if the jury should be of opinion that the ditch or dead timber above the dam was the cause of the " smells and stenches " complained of.

5th. That under the terms of the indictment, the defendant should be acquitted, if the jury should be of opinion that the timber in the bottom, above the dam, was killed either by the ditch, or by the natural filling up from the cultivation of the lands above, or from both combined.

6th. That under the indictment, the defendant should be acquitted, if the jury should be in doubt as to whether the dam had *any indirect, or consequential agency*, either by itself, or in connection with the ditch and dead timber above, in producing the "smells and stenches " complained of.

These propositions were read to the jury, and the Court, sub-

stantially, ruled the 1st, 2d, 4th and 5th points; but as to the 3d and 6th points, ruled them, in modified form, so as to make them conform to the points stated on behalf of the State below, which were approved.

On behalf of the State, the following propositions and principles were submitted:

" We ask the Court to charge that it is a fundamental principle of social, natural and municipal law, which prescribes to every one, in the use and enjoyment of his own property, the necessary limitation, that he shall not injuriously affect the rights of others; that if defendant's obstruction of Three and Twenty Creek, by a mill dam, has been the cause, either *directly* or *indirectly*, of producing such an effect upon the low grounds above, as to induce the engendering of *malaria*, humid atmosphere, or other poisonous quality in the atmosphere, *whereby* the people generally were made sick, and injured in the enjoyment of their lives and property, that then he · has not so used his own property as to avoid injury to the rights of others, and he is guilty of "erecting and keeping up " a public nuisance; and the charges in the indictment are proved; and, concluding that they are so proved, it is no defense to say:

1st. That the dam and pond have been kept up in the same place for seventy years, or for any other length of time.

2d. · Or to say that the people of the community remained healthy for 69 years of the 70 years, if during the last year it became, and is now a nuisance.

3d. Or to say that there are persons or families in the neighborhood who escaped the prevailing sickness. It is enough if they were generally sick.

4th. Nor is it a defense to say that the dam had been kept at the same height all the time, and defendant has done no physical act calculated or designed to injure the community; that if the mill pond had become, or caused a nuisance, every day the dam remained standing across the stream, was, in contemplation of law, an " erecting " by the defendant, and merely keeping it up is all the act that was necessary to render him " guilty."

5th. Nor is it an answer to say that the property is valuable to the · defendant; that the testimony on that point is irrelevant: the value of the property of a citizen can not be weighed in the balance against the health and lives of a whole community.

In a Nut Shell.—If the defendant's mill pond, either directly or indirectly, was the exciting cause of the sickness that has pre-

vailed in the community, in greater or less degree, for several years, and particularly during the year 1871, and during the latter year the people generally were affected thereby, then he is guilty; and lapse of time, value of property, nor any other matter relied on, can avail the defendant."

The above propositions and principles, submitted on the part of the State, were read to the jury, and ruled as law.

Whereupon the defendant excepted.

Under the instructions the jury found the defendant "guilty."

The defendant appealed and gave notice that he would move the Supreme Court in arrest of judgment, upon the grounds taken on the Circuit, and also upon the grounds:

I. That in none of the counts is any disease, or any disease by name, alleged to exist, affecting the inhabitants of the vicinity, and specified as being the result of, or connected with the unwholesome or putrid air.

II. That, inasmuch as malarial disease was everywhere prevalent, there should have been allegations in the indictment, and corresponding proof, that any disease which affected the inhabitants, near the alleged nuisance, was the direct effect thereof.

III. That the description of the locality in the third count, to wit: "a certain and ancient water-course, called Three and Twenty Creek, with earth, gravel and material, did obstruct and stop up," is defective and insufficient to support a verdict.

IV. That no judgment or abatement can be enforced, because the indictment contains no averment as to *the continuance* of the alleged nuisance.

And failing in that motion, then for a new trial, on the grounds:

I. Because the presiding Judge charged the jury that no lapse of time or prescription could, in any way, help the defendant, as against an indictment for public nuisance; although he had only used his own property, according to his title and prescription right, for at least seventy years, and had done no physical act designed or calculated to injure any one.

II. Because his Honor charged the jury, that if the sickness was produced by the dead timber, in the low grounds of the creek, miles above the dam, and the dam had *any agency* by itself or in conjunction with other causes, such as the ditch, or the natural filling up from cultivation above, in deadening the timber, then the defendant was guilty of a nuisance.

III. Because his Honor charged the jury that, in an issue of nuisance, or no nuisance, there was no difference between natural or proximate, and indirect or remote causes; that if the dam had *any agency*, direct or indirect, proximate or remote, natural or consequential, in producing the sickness complained of, the defendant was guilty of a nuisance.

IV. Because the verdict rendered, under the charge of his Honor, is unsupported, either by the evidence, the justice, or the law of the case.

*McGowan and Moore, Thomson,* for appellant.
*Perry,* Solicitor, *Whitner, Reed and Brown,* contra.

Aug. 7, 1872.  The opinion of the Court was delivered by

Moses, C. J.  So much of the appeal as seeks to arrest the judgment cannot be sustained.  It does not appear from the brief that any application to that end was made in the Circuit Court.  It therefore comes before us an original and independent motion, which we have not the power to entertain.—Const., Sec. 4, Art. IV. *State* vs. *Bailey,* 1 S. C., 1; *Floyd* vs. *Abney,* Ibid, 114; *Elmore* vs. *Scurry,* Ib., 139.

We must, therefore, limit our enquiry to so much of the appeal as claims a new trial for the alleged errors of law by the presiding Judge of the Court below.  So far as the points presented to him as questions of law, or asked to be submitted to the jury as grounds of defence, are identical, or of a like character with either of the causes urged in arrest of the judgment, the defendant will substantially have the benefit of their consideration.

It is denied that the indictment will lie, as the offence, if any, is a private and not a public nuisance.  Whether it is the one or the other, depends upon the extent of its existence.  If it annoys the community in general, and not merely some particular person, it is indictable and not actionable.—4 Blk. Com., 167; *Rex* vs. *White,* 1 Burr., 337.  Where the act is charged as in or near a highway, "*per quod* the air thereby is corrupted," it is punishable as a public nuisance.— *Rex* vs. *Papineau,* 1 Str., 686; *Carey* vs. *Brooks,* 1 Hill, 367.  If it affects the highway, and extends its hurtful influence so as to comprehend whole neighborhoods, the only remedy is by indictment, though one who has suffered a particular damage, beyond that which the public has experienced, may, in respect thereof, maintain an action.—Bac. Ab., Title *Nuisance,* D., 2 Ld. Ray, 985.  Here the charge is, that the defendant " did erect, or caused to be erected,

a certain dam across Three and Twenty Creek, a common and ancient water-course, by means of which," &c.

The third count is not very artificially drawn, nor, in fact, is the indictment framed in exact conformity with the most approved precedents, and yet it may suffice. The statement in the said count may save it from the charge of vagueness as to time and locality. The date of the offence is not material, if it is before bill found, and there is enough to inform the defendant of the nature and character of the charge, and of the place which is an incident of it, to enable him advisedly to prepare his defence. If it is stricken out, it is not perceived, in view of the first count, how the defendant could be benefited.

The point taken no way resembles that which was sustained in *State* vs. *Graham*, 15 Rich., 310. There the indictment was " for obstructing a public landing," and the proof was the obstruction of a public road leading to the landing at a place within one hundred yards of it.

If it was intended on the part of the defence to make any question as to the introduction of testimony to shew sickness and disease in the neighborhood, it should have been objected to at the time. Its admissibility depended on its competency, and this was conceded when no exception was taken at the time it was offered. It, however, can in no manner avail the defendant. To constitute a nuisance, as was said by Lord Mansfield, in *Rex* vs. *White and Ward*, 1 Burr., 337, "it is not necessary that the smell should be unwholesome; it is enough if it renders the enjoyment of life and property uncomfortable."

In *Rex* vs. *Neill*, 2 B. & C., 12 E. C. L., 226, it was held " that to support an indictment for a nuisance, it is not necessary that the smells produced by it should be injurious to health; it is sufficient if they be offensive to the senses." Independent, however, of the rule sustained by these authorities, it was competent, under the allegation in the several counts of damage, "to the persons there passing, repassing, dwelling and inhabiting," to introduce testimony to shew injury to health, as a consequence more prejudicial than any alone obnoxious to the senses, because of its unpleasant odor, and not productive of sickness.

The right to property from long possession, either directly from the operation of the Statute of Limitations, or arising from the presumption of an original cession by grant, cannot be applied to sanction or uphold its use or devotion to purposes not permitted by

the State, either as affecting its own sovereignty or the rights of third persons. Chitty, in his 1st Volume of Criminal Law, 160, says: "It has been repeatedly held that no length of time can legalize a public nuisance, although it may afford an answer to an action by a private individual;" and Ch. J. Parsons, in *Town of Stoughton* vs. *Baker et al.*, 4 Mass., 522, observes "that no laches can be imputed to the Government, and against it no time runs so as to bar its rights." See also, *Hall* vs. *Richards*, 9 Wendell, 315.

While the long possession may confer a right to the land flowed, and all the proprietory incidents which follow the title to property, it can not be set up as a bar to the abatement of a nuisance on behalf of the public. A right to violate the law is not to be presumed as allowed by the State itself, for this would be inconsistent with the very purpose for which it was created, and would involve an absurdity too violent to be entertained even for a moment.

The points thus made for the appellant, which we are at liberty to consider, have been examined and determined; it remains only to enquire whether the charge of the presiding Judge, as to the acts of the defendant, on which his liability depended, was in conformity with the rules which are to be applied as the law of the case. It is recognized as a fundamental principle, necessary for the safety and protection of society, that no one, in the use of his property, shall injuriously affect the rights of others. While this is admitted, how far and to what extent the limitation is to operate on the consequences which may accrue to third persons from the lawful use of one's property, often presents an enquiry to be determined by nice and delicate discrimination. One is supposed to be capable of foreseeing the consequences of his own action, and must, therefore, be responsible for any wrong or damage which results from it; hence there is no doubt as to his liability for the natural and proximate results of a legal act, which is the source of injury to another. A distinction is made between an act in itself lawful, and one that is forbidden, whether *malum in se* or *malum prohibitum*, and they will not be both subject to the same rules in regard to their effect in reference to the rights of others.

While it is true that the defendant would be liable if his obstruction of the creek, by his pond and dam, was in itself the cause of the injuries complained of, yet, if the consequences are to be attributed to the acts of others, so affecting his property that it becomes a public nuisance, it would not appear consistent with justice or propriety that he should be held to responsibility.

29

The mere erection of the mill and dam on his own land was no nuisance; and if results, though injurious, yet not proximate and direct, followed, because set in motion by the acts of others, either in cutting the ditch, which, by the accumulation of sand, choked the channel and raised it higher than the adjacent banks, thus forcing the water over the edges of the ditch or banks, and collecting it in pools or holes, or from the increased cultivation in the neighborhood, it would seem that the consequences are to be referred to an agency operating on the property of the defendant, for which he should not be liable, because not employed by him. They were not proximate or direct, in the legal sense in which those terms are understood. He must be held accountable for the unlawful effects which naturally or directly proceeded from his acts.

In civil actions fixed and adjudged rules have been adopted. On the criminal side of the court the authorities are few, and none that we have examined of express bearing on the question we are now considering. One is held liable to an action for a private nuisance, arising out of the use of his own property, because in such use he has infringed upon the rights of others. A conviction for a public nuisance proceeds upon the same principle applied to the public, and not to individuals. In civil cases, however, a defendant is not responsible for results, except such as are natural, proximate and direct.—2 Green. Ev., §§ 256, 635; *Whatley* vs. *Murrell*, 1 Strob., 389; *Harrison* vs. *Berkley*, Ib., 548; *Carey* vs. *Brooks*, 1 Hill, 365.

In the case before us, the presiding Judge did charge " that the defendant should be acquitted if the jury should be of opinion that the timber in the bottom, above the dam, was killed either by the ditch or by the natural filling up from the cultivation of the lands above, or from both combined," or "if the ditch or dead timber above the dam was the cause of the 'smells and stenches' complained of." We think, however, that he should have gone further and instructed them that if, in their opinion, the dam, in itself, or conjointly with the pond, was the cause of the alleged injuries, the defendant should be convicted; but if other causes, to which he did not contribute, and which did not arise from his agency, so affected the dam and pond, or either, as to produce them, then they were too remote to be ascribed to his act, and the verdict should be in his favor.

The motion for a new trial is accordingly granted.

*Willard*, A. J., and *Wright*, A. J., concurred.