IDA MAE SOUTHWELL, ADMINISTRATRIX OF H. J. SOUTHWELL, v. AT-
LANTIC COAST LINE RAILROAD COMPANY.

(Filed 17 February, 1926.)

**1. Commerce — Courts — Concurrent Jurisdiction — Federal Employers'
Liability Act—Federal Decisions.**

Where the State court wherein the action was brought has concurrent
jurisdiction with the Federal Court over the subject-matter under a
Federal statute, as in this case, the Federal Employers' Liability Act, in
interstate commerce, the decisions of the Federal Court will control.

**2. Master and Servant—Employer and Employee—Safe Place to Work—
Railroads.**

Under the Federal Employers' Liability Act the master is not held
to the duty of an insurer in providing his servant a safe place to work,
but only to exercise due care therein, which duty is nondelegable, and is
only liable in its negligent failure to do so, proximately resulting in the
injury.

**3. Same—Wrongful Death—Survival of Action.**

Under the Federal Employers' Liability Act a cause of action survives
the negligent killing of an employee, in behalf of the beneficiaries named
in the statute.

**4. Courts — Jurisdiction — Evidence — Nonsuit—Trials—State Courts—
Federal Courts—Federal Employers' Liability Act.**

On defendant's motion as of nonsuit in an action brought in the State
court under the Federal Employers' Liability Act, the rule in our juris-
diction that the evidence is to be construed in the light most favorable to
the plaintiff applies.

**5. Master and Servant — Employer and Employee — Negligence — Safe Place to Work—Homicide—Federal Employers' Liability Act—Evidence—Nonsuit.**

In an action to recover damages from a railroad company for a wrongful death negligently caused to an employee in interstate commerce, there was evidence tending to show that the deceased was an engineer on defendant's train and was killed by another employee, assistant yardmaster, who also had been deputized as a special policeman during a strike, as the deceased was still on the defendant's premises and preparing to leave after he had completed his run, and that his coemployee and he had bad blood between them and threats had passed, with the knowledge of the defendant's vice principal, and under such circumstances that the vice principal could reasonably have anticipated the occurrence, and have prevented the killing; that he knew that the coemployee was armed with a pistol, and shot the deceased while unarmed, without provocation: *Held*, sufficient upon the defendant's actionable negligence in failing to supply the servant with a safe place for the performance of his duties, and to deny defendant's motion as of nonsuit.

**6. Same—Issues—"Wanton and Wilful Killing."**

Where an action for a wrongful death is made by the pleadings to rest solely upon the issue as to plaintiff's negligence, and the evidence is in conformity therewith, an issue submitted by the defendant as to whether the act was "wanton and wilful" is properly refused.

**7. Evidence — Cross-Examination — Contradictory Statements of a Witness—Questions for Jury—Nonsuit.**

Where a witness has testified on cross-examination contradictory of material matters theretofore testified on direct examination, the weight and credibility of the evidence is for the jury, and a motion as of nonsuit predicated thereon will be denied.

APPEAL by defendant from *Dunn, J.,* and a jury, at May Term, 1925, of NEW HANOVER. No error.

Civil action brought by plaintiff, administratrix of deceased, to recover damages for alleged negligence of the defendant that resulted in the death of plaintiff's intestate.

Defendant objected to the second issue and tendered the issue: "Was plaintiff's intestate killed by the wanton and wilful act of H. E. Dallas?" The court below refused to submit the issue. Defendant duly excepted and assigned error.

The issues submitted to the jury and their answers thereto were as follows:

"1. Was the plaintiff's intestate, at the time of the killing engaged in interstate commerce? Answer: Yes.

"2. Was the plaintiff's intestate killed by the negligence of the defendant, as alleged in the complaint? Answer: Yes.

"3. If so, what damage is plaintiff entitled to recover of the defendant? Answer: $12,000."

On the trial in the court below, the defendant introduced no evidence, but made numerous exceptions and assignments of error to admission and exclusion of evidence, to refusal to give its prayers for instructions and to certain excerpts from charge as given, and appealed to the Supreme Court.

*L. Clayton Grant, Weeks & Cox and Dye & Clark for plaintiff.*
*Thomas W. Davis and Rountree & Carr for defendant.*

CLARKSON, J. At the close of all the evidence plaintiff's counsel consented that the court might answer the first issue "Yes," and that the evidence of the defendant upon the question of the deceased being engaged in interstate commerce should be eliminated from the record on appeal. On the first appeal of this case, defendant made a motion for judgment as of nonsuit (C. S., 567), at the conclusion of plaintiff's evidence. Plaintiff appealed to the Supreme Court and the judgment of nonsuit was set aside and a new trial awarded. *Southwell v. R. R.,* 189 N. C., p. 417. From the finding on the first issue the alleged actionable negligence must be determined under the Federal Employers' Liability Act.

"In construing a Federal Statute, a State Court is bound by the construction placed on it by the Federal Courts." 7 R. C. L., p. 1013; 25 R. C. L., p. 955; Statutes, sec. 219; *Mangum v. R. R.,* 188 N. C., p. 694.

In *Barbee v. Davis,* 187 N. C., p. 83, we said: "The Federal Employers' Liability Act, enacted by Congress, has been held constitutional, under the power committed to it by the commerce clause of the Constitution, and all states are bound by its provisions. The Constitution of the United States is the 'golden cord' that binds the states together." 264 U. S., 588. *Second Employers' Liability Cases,* 223 U. S., 1; *Philadelphia B. & W. R. Co. v. Schubert,* 224 U. S., 603.

The Federal Employers' Liability Act (the first was declared unconstitutional), the second was approved 22 April, 1908, and declared constitutional by the Supreme Court of the United States, 15 January, 1912. *Second Employers' Liability Cases, supra.*

Roberts Injuries Interstate Employees, pp. 5, 6, 7, says: "The first section provides that every common carrier by railroad while engaged in interstate commerce, shall be liable to every employee while employed by such carrier in such commerce or in case of his death, to certain beneficiaries therein named, for such injury or death, resulting in whole or in part, from the negligence of the carrier, or its employees, or by defects or insufficiencies due to negligence in any of its equipments or property. The second section provides that every common carrier by railroad on lands of the United States other than streets shall be liable

in the same way to any of its employees. The third section provides that contributory negligence shall not bar recovery, but shall only diminish the damages, except that no employee injured or killed where the violation of a safety law for employees contributed to the injury, shall be held to have been guilty of contributory negligence. The fourth section provides that assumption of risk shall not be a defense, where the violation of a safety law contributed to the accident. The fifth section declares all contracts or devices intended to exempt the carrier from liability under the act to be void, except that the carrier may plead as a set-off any sum if paid to the injured employee as insurance or relief fund. Section six provides that any action under the act is barred after two years. Section eight provides that the act does not limit the obligation of a common carrier under any other Federal law or affect any pending suits under the 1906 act." At pp. 10, 11, it is said: "In 1910 Congress passed two important amendments to the Federal Employers' Liability Act. One provides that any action under the act may be brought in a circuit court of the United States in the district of the residence of the defendant, or in which the cause of action arose or in which the defendant shall be doing business at the time of commencing such action, and further provides that the jurisdiction of the courts of the United States *shall be concurrent with that of the courts of the several states,* and any case arising under the act and brought in any state court shall not be removable to any of the United States. The second amendment provides, that, 'any right of action given by this act to a person suffering injury shall survive to his or her personal representative, for the benefit of the surviving widow or husband and children of such employees, parents, and, if none, then of the next of kin dependent upon such employee, but in such cases there shall be only one recovery for the same injury.' "

"In construing the Federal Employers' Liability Act, the decisions of the national courts control over those of the state courts. For example, in determining when a carrier is guilty of negligence under the act; when an employee assumes the risk; what proof creates a dependency in death cases within the meaning of the act; whether there is any evidence tending to show liability sufficient for the case to be submitted to the jury; the measure of damages and instructions thereon, are all matters upon which the decisions of the national courts control. Where the decisions of the Federal courts on a question under the act are conflicting, then a state court will follow those decisions of the national courts which appear to it to rest on the better reason. . . . In all actions under the Federal Employers' Liability Act prosecuted in the state courts, the rules of practice and procedure are governed by the laws of the states where the cases are pending. Questions as to whether

amendments shall be permitted to petitions or answers; when motions to elect should be sustained or overruled; the rules of evidence; variances; excessiveness of verdicts and similar questions of practice and procedure, are matters to be determined solely by the state courts in accordance with the statutes of the state and their rules applying the same." Roberts, *supra,* pp. 15, 16.

"The first section of the Federal Employers' Liability Act provides that every common carrier by rail while engaging in interstate commerce and while the servant injured or killed is employed in such commerce, is liable *'for such injury or death resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier,* or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipments.' . . . The clause relating to negligence in the first section of the Federal act has two branches; one governing the negligence of any of the officers, agents or employees of the carrier, which abolishes the common-law fellow-servant doctrine; and the other relating to defects and insufficiencies due to negligence in the railroad's rolling stock, machinery, track, roadbed, works, boats, wharves, or other equipment. These two clauses, it has been held, cover any and all negligent acts of which the carrier could have been guilty under the common law. . . . Except that it abolishes the common-law rule of nonliability for injuries to employees within its terms due to negligence of fellow-servants, the first section of the Federal Employers' Liability Act which defines when a carrier is liable, adopts the common-law rule of negligence as to the two branches of liability mentioned. Under the act, the company is not a guarantor of the safety of the place of work or of the machinery and appliances of the company. *The extent of its duty to its employees is to see that ordinary care and prudence are exercised to the end that the place in which the work is to be performed* and the tools and appliances of the work may be *safe for the workmen.* To convict a defendant railroad company under the first section as to defects, the plaintiff must prove the existence of the defect complained of; that it was a defect of such a character as to cause its existence to be a negligent failure on the part of the defendant and that the defect was the proximate cause of the injury." (Italics ours), Roberts, *supra,* pp. 18, 19, 20.

One of the leading cases under the Federal Employers' Liability Act was that of *Seaboard A. L. R. Co. v. Horton,* 233 U. S., p. 501, reversing this Court (162 N. C., 424). *Mr. Justice Pitney* said: "It was the intention of Congress to base the action upon negligence only, and to exclude responsibility of the carrier to its employees for defects and insufficiencies not attributable to negligence. The common-law rule is

that an employer is not a guarantor of the safety of the place of work or of the machinery and appliances of the work; the extent of its duty to its employees is to see that ordinary care and prudence are exercised, to the end that the place in which the work is to be performed and the tools and appliances of the work may be safe for the workmen. *Hough v. Texas & P. R. Co.,* 100 U. S., 213; *Washington & G. R. Co. v. McDade,* 135 U. S., 554; *Choctaw, O. & G. R. Co. v. McDade,* 191 U. S., 64, 67." Under the act the alleged negligence must be the proximate cause of the injury.

State laws, in so far as they cover same field were superseded by Employers' Liability Act of 1908. See cases cited in Rose's Notes on U. S. Reports, Revised Ed. Supplement, vol. 4 (1925), p. 1022.

In 20 Rose's Notes on U. S. Reports, p. 1079, to *Seaboard Air Line R. R. Co. v. Horton, supra,* is said: "Question whether railroad is negligent in leaving water crane so close to track as to injure brakeman on duty was for jury. *Renn v. R. R.,* 170 N. C., 139, holding railroad is under duty to furnish safe place to work and allowing recovery for injuries to pump repairer slipping on ice." In the *Renn case, supra,* this Court has discussed the U. S. cases and followed the negligence rule as laid down by the Supreme Court of United States in the *Horton case.* This is the well established rule of this Court and reiterated frequently at the present term. For example, speaking to the subject in *Barnes v. Utility Co.,* 190 N. C., p. 387, this Court held: "It is the duty of the master, in the exercise of ordinary or reasonable care, to furnish or provide his servant a reasonably safe and suitable place in which to work. This duty is primary and nondelegable. *Cable v. Lumber Co.,* 189 N. C., p. 840; *Riggs v. Mfg. Co., ante,* 256; *Paderick v. Lumber Co., ante,* 308." *Riggs case, supra*: "The master is not an insurer." The failure of the duty must be the proximate cause of the injury.

The defendant relies on its motion of judgment as of nonsuit. C. S., 567. In its brief it states: "The present trial was before Dunn, J., and defendant moved for nonsuit at the close of plaintiff's evidence, and also at the close of all the evidence, which motions were overruled, and verdict and judgment for plaintiff for $12,000 was rendered, and the defendant appealed from said judgment."

The accepted rule of actionable negligence in this State is that of the United States. The common-law rule.

The question here presented did defendant under *Horton case, supra,* "see that ordinary care and prudence is exercised to the end that the place in which the work is to be performed . . . may be safe for the workman," and was the failure the proximate cause of the injury?

"On a motion to nonsuit, the evidence is to be taken in the light most favorable to plaintiff, and he is entitled to the benefit of every reasonable

intendment upon the evidence, and every reasonable inference to be drawn therefrom. *Christman v. Hilliard,* 167 N. C., 6; *Hancock v. Southgate,* 186 N. C., 282; *Oil Co. v. Hunt,* 187 N. C., 157; *Hanes v. Utilities Co.,* 188 N. C., 465; *Lindsey v. Lumber Co.,* 189 N. C., 119; *Baltimore & O. R. R. Co. v. Groeger,* U. S. Supreme Court (filed 5 January, 1925)." *Barnes v. Utility Co.,* 190 N. C., 385.

The language in the *Groeger case,* U. S. Supreme Court, *supra,* is: "The credibility of witnesses, the weight and probate value of evidence are to be determined by the jury and not by the judge. However, many decisions of this Court establish that, in every case, it is the duty of the judge to direct a verdict in favor of one of the parties when the testimony and all the inferences which the jury could justifiably draw therefrom would be insufficient to support a different finding."

Is there sufficient evidence under the law to be submitted to the jury, that discloses a failure by defendant to perform its duty which proximately caused plaintiff's intestate's death?

The facts, taken in a light most favorable to plaintiff, are as follows: Union Station in Wilmington, N. C., is so arranged that there is a concourse for passengers to go through leading to gates which one passes through as a passenger coming from or going to the trains, from Front Street in Wilmington. For employees, it is different. In going or coming from Front Street ordinarily the employees cross a concrete bridge, just west and north of the concourse for passengers, and enter through a gate to an enclosure to go to or return from the train sheds and railroad tracks, in the discharge of their duties. This enclosure is on the premises and under the control of defendant. At the time of the occurrence, the Lieutenant of Police office, claim agent office and office of station or yardmaster, were side by side and facing the enclosure inside the gate—the station or yardmaster's office, with a door faced the enclosure just inside and at the gate entrance. Inside the enclosure, not far from the gate fence entrance to station, and near to station or yardmaster's office door was the head of steps to lower yard. H. E. Dallas, on 18 July, 1922, occupied the position of assistant yardmaster and E. L. Fonville was general yardmaster in charge of all terminal employees working on Wilmington terminal. Dallas had authority under Fonville. The next superior officer above Fonville was the superintendent, W. H. Newell, Jr. As yardmaster, Fonville had authority, for failure to obey his orders, to hold an employee out of service and pass investigation to superior officer with recommendations, which are usually followed in such matters. Dallas was a special police officer sworn in by the mayor of Wilmington, at the request of the defendant, about ten days to two weeks before the shooting. H. J. Southwell, plaintiff's intestate, was an engineer and ran from Wilmington to Fayetteville and return. It was

customary for the engines to be left at the roundhouse when in from a run, and it was customary for the engineers to go to the wash house and change clothes before going off the premises. The wash house was near the train sheds, some distance from the exit and entrance gates of employees. At the time of the killing of Southwell by Dallas, there had been a strike among the shopmen and the property of the railroad was picketed. A. L. Kelly was Lieutenant of Police department, for the railroad at Wilmington, N. C. C. B. Holloman was a special officer under Kelly and their office was near the gate. The strike started 1 July, and between that time and the killing, on the 18th, Fonville had seen Dallas carrying a pistol on the premises of the railroad company. On 18 July, and for some time prior thereto he had been performing other duties additional to the ordinary duties of assistant yardmaster, in the nature of inspecting and working on outgoing and incoming trains, which carried him about different places on the yard, Smith Creek yard and Union Station. Dallas worked in the yard office under Fonville, he was car inspector at different places—worked as inspector under shed.

Southwell's attitude was antagonistic towards the strike-breakers. W. H. Newell, Jr., superintendent of defendant company, had discussed the difference between Southwell and Dallas with Southwell, prior to the killing, in the presence of C. S. Taylor, master mechanic and shop superintendent of defendant, cautioned him about the remarks he had made to Dallas—that if anything happened to Dallas, in view of his remarks it would not look good for him; he, Newell, would have little influence in getting him out of trouble. He told Southwell to go ahead about his work and keep his mouth shut and attend to his own business. Dallas had told Fonville (this was known to Newell) that while working out on the train on which Southwell was engineer he laid his raincoat down and when he went back to get it Southwell had removed it. Southwell asked him what he was looking for, he told him his raincoat. Southwell replied he would not need it he would need a wooden coat. And again, Dallas went in between two cars to adjust an air hose or stop a leak that the cars moved forward and when he came out he remarked to Southwell "You liked to have gotten me that time." Southwell said: "Better luck next time," and used abusive language. The tracks run east and west and are numbered 1, 2, 3, 4, 5, 6, etc., 6 being north of 1. Fonville saw Dallas near 7 o'clock, the evening of the killing. They were at Union Station together under the shed, about the butting block at railroad track No. 6, five to eight minutes before the killing. They went together in a westwardly direction on the premises ordinarily used by the employees—towards the front gate or outlet. Fonville's office was the first westwardly as you come in the entrance gate. From track 6 to the place of the killing was about 150 feet and about 30 feet from

Fonville's office door. Fonville saw a gun in Dallas' possession as they went along—38-calibre blue steel pistol. It came near falling out of his pocket. He had his arm around Dallas' waist at the time. Dallas had previously stated the incidents before related with Southwell. At the time Fonville had his arm around Dallas, in the conversation Dallas said: "I want to see Southwell and ask him to lay off of me and let me alone." To use his exact words, he said: "Cap, all I want to do is to ask Southwell to lay off of me and let me alone." This was said the second time at the gate just prior to the killing.

There was a difference how the shooting occurred. It took place on defendant's premises, which was practically enclosed, about 40 feet from the gate exit that Southwell was going to from work. About 12 or 15 feet from office of A. L. Kelly, Lieutenant of Police. He was there immediately after the firing. Southwell, freight engineer, had come in on his run, put his engine up and gone to the engineer's wash room. The wash room is not far from track 6, where Fonville and Dallas started on their way to Fonville's office at the gate. The time Southwell's train came in was known to both Fonville and Dallas. Fonville, on the way from track 6 to gate had his arm around Dallas, with knowledge of the blue steel 38-calibre pistol that Dallas had. Armed, Dallas, tells Fonville then at the gate that "All I want to do is to ask Southwell to lay off of me and let me alone." At the time Fonville knew the "wooden coat" and "better luck" incidents, told him by Dallas. According to Fonville, at the time he and Dallas parted at the gate, the exit for Southwell, Dallas again repeated "Cap, all I want to do is to ask Southwell to lay off of me and let me alone." He addressed his superior officer "Cap," acknowledging authority. Fonville, from what he said, did not restrain his subordinate. Both, standing at the gate. Southwell, the engineer, had come in on his run, put up his engine and had gone to the wash room, cleaned up and near 7 o'clock p. m. started to his home. He had in his right hand his engineer's bag, brown tin box made grip fashion, and to leave the defendant's premises started towards the gate to get on Front Street. He was shot by Dallas on the premises of defendant about 40 feet from the gate, and 6 or 8 feet of the superintendent's office building.

The testimony of Fonville that he and Dallas parted at the gate and he told Dallas not to see Southwell; that if he saw Southwell and talked to him it might bring about unpleasant circumstances, and went in the direction of his office—casually took a look to the right and saw Dallas and Southwell approaching each other, knowing there was enmity between the two turned back and went for the purpose to separate them. Got about 3 steps further in direction of parties and gun fired. After the shooting Dallas went immediately into Fonville's, the yardmaster's, office.

11—191

SOUTHWELL *v.* R. R.

A. T. Peters testified, in part: "While standing there I saw two men pass, one had his arm around the other one; one was Mr. Dallas and he was on the right and they were going toward the gate that lets out on Front Street. The same walk goes out to Front Street and runs back to the express office, and is on the west side of the bridge. I saw Mr. Dallas when they tried the criminal case and he was the man I saw pass. The other man was kind of pulling him along going toward this gate when I seen them. I can't describe this other man but he was built like Mr. Fonville. He seemed to be trying to carry him and pull him off toward the gate there and his coat was up off of that gun and I happened to see the gun; at least a colored person coming from the express office said: 'Cap, you are about to lose your gun.' That's how come me to look at it and see it. Then I got behind the steel door and stayed behind it, I reckon, three or four minutes, I don't know exactly how long, but a short interval of time, and I heard the gun fire. I looked out and seen a man running, and this same man I had seen with the gun in his pocket following him."

Southwell, after he was shot, said: "Oh, Lord; Oh Lord; I am going to die," and told E. C. Marshburn immediately after the shooting; "I am shot, Dallas shot me through and through and I am going to die."

Ida Mae Southwell, his widow and plaintiff administratrix, testified that Southwell was 43 years old and in good health; earned $250.00 a month. They had two children—a boy and girl—8 and 11 years old; personal living expenses amounted to about $50.00 a month. Weighed about 175 pounds. He died following morning 3:30 o'clock after he was shot. 'Q. What did he say with reference to how he was shot?" Ans.: "Why he said he was coming from his engine on his way home, and just as he got in the concourse he saw two men come from behind a truck, and one went in the opposite direction from the other, and he said Mr. Dallas came up to him with the gun raised to his head and just as he approached him, he knocked it down, and the load went in his stomach, and that Dallas said: 'I am going to kill you; this is your last day,' and Mr. Southwell said: 'If we have any difference let's settle it another way.' He said the man that turned was Mr. Roy Fonville, Mr. E. L. Fonville, who testified here yesterday."

There was some evidence that Dallas was on duty as to railroad matters at the time, but it was admitted that Dallas was at the time of the killing a special police officer, sworn in at the request of defendant; taking meals three times a day in the dining car, was armed, inside the enclosure with the knowledge and with his superior, Fonville, and discussing the attitude of the engineer towards him, admittedly immediately before the killing.

The complaint was based on negligence and not a "wanton and wilful act," as contended by defendant. It is charged in the complaint "that the defendant negligently failed to discharge its duty to plaintiff's intestate in that it failed to (use due care) furnish him a safe place to work," etc. It then gives the details of the failure. The court below, in construing the complaint founded the issue on negligence and on this theory it was tried. The court below, without exception by defendant, charged the jury: "Therefore, gentlemen of the jury, it becomes necessary for the court to charge you as to what constitutes negligence. Negligence is the failure to do what a reasonably prudent man, guided by those circumstances which ordinarily regulate the conduct of human affairs, would do, or the doing of something which an ordinarily prudent man would not have done under the existing facts, or similarly situated. In determining whether due care has been exercised in any given situation by the party alleged to have been negligent, reference must always be had to the facts and circumstances of the case, and the surroundings of the party at the time, and he must be judged by the influence which those facts and circumstances and his surroundings would have had upon a man of ordinary prudence in shaping his conduct, if he had been similarly situated, but every negligent act does not, of itself, involve liability. The conduct of the party sought to be charged, or his failure to exercise proper care, must amount to what is known in law as actionable negligence, and in order to establish actionable negligence in the case at bar, and before you can answer the second issue 'yes' the plaintiff is required to show by the greater weight of the evidence, the burden being upon her, first, that there was a failure upon the part of the defendant company to exercise proper care in the performance of some legal duty which it owed to the plaintiff's intestate under the circumstances in which they were placed; proper care being that degree of care, which a reasonably prudent man would have exercised under like circumstances and when charged with a like duty, and, second, that such negligent breach of duty was the proximate cause of the death of plaintiff's intestate and, by proximate cause is meant the dominant, efficient cause, the cause without which an injury would not have occurred; the cause that produced the result complained of in continuous sequence, and one which any man of ordinary prudence could have foreseen would probably result under the facts as they existed. . . . Now the court charges you that a master owes a servant the same duty with respect to his person that it does to a third person, and is required to exercise due care for his safety; so, without regard to whether Dallas was or was not on duty at the time he shot and killed plaintiff's intestate, the court charges you that the defendant company owed Southwell the legal duty of protecting him from a sudden assault by H. E. Dallas

if, in the exercise of proper care and by doing what a reasonably prudent man would have done under the circumstances, it could have foreseen that an assault would probably have been made upon engineer Southwell by Dallas in time, by the exercise of ordinary care, to have prevented it. Now, the court charges you that if the plaintiff has satisfied you by the greater weight of the evidence that at the time of the killing of engineer Southwell, the defendant, through its officers, or agents, knew, or by the exercise of proper care, could have known, that Dallas intended to assault engineer Southwell, and, if the plaintiff has further satisfied you by the greater weight of the evidence that by the exercise of proper care the defendant through its officers and agents could have prevented the altercation which resulted in the death of plaintiff's intestate, and you further find, by the greater weight of the evidence, the burden being upon the plaintiff, that the defendant through its officers and agents, failed to exercise that care and take those precautions which an ordinarily prudent man would have exercised and taken under the existing circumstances to prevent the altercation between the two men which resulted in the death of engineer Southwell, then such failure on the part of the defendant company would be negligence and, if you are further satisfied by the greater weight of the evidence, the burden being upon the plaintiff, that such negligence was the proximate cause of the death of plaintiff's intestate, it would be your duty to answer the second issue 'yes,' for it is the duty of the master to take such precautions as a man of ordinary prudence, under similar circumstances, would have taken, for the purpose of protecting an employee against a peril of the transitory class." To the foregoing paragraph defendant excepted, because there was not sufficient evidence to go to the jury on the questions involved. We are of the opinion that the evidence was sufficient and the assignment of error cannot be sustained.

The first position of defendant is: "The court erred in admitting evidence of a telephone conversation by Dallas to ascertain if Middlebrook, a trainman, had left home to report for work, for the purpose of showing Dallas was engaged in the duties of his employment." We think, under all the evidence, the admission of this incident is not prejudicial.

The third position of defendant is: "The killing of Southwell by Dallas was a wilful act, wholly outside of the scope of the employee's authority and the defendant is not liable therefor." We do not think this position applicable under the facts and circumstances of this case. It is well settled that plaintiff cannot recover for "wilful injury," but only in case of negligence, on which theory the case was tried. Thornton's Fed. Employers Liability Act (3d ed.), sec. 196, and cases cited.

The fourth position of defendant is: "The court erred in submitting the question of negligence as the second issue, instead of the issue of

whether intestate was killed by the wanton and wilful act of Dallas, tendered by defendant." We do not think this position applicable under the pleadings and facts and circumstances of this case.

The gist of the controversy is defendant's second position: "There is no evidence in this record to authorize a finding that defendant was negligent in failing to protect Southwell from Dallas, or otherwise."

We think the facts and circumstances in the present appeal substantially those in which the motion as of nonsuit was overruled in the prior appeal to this Court. *Southwell v. R. R.,* 189 N. C., *supra.*

In *Wimberly v. R. R.,* 190 N. C., 447, it is said: "Animadverting on a similar situation in *Shell v. Roseman,* 155 N. C., 94, *Allen, J.,* said: 'We are not inadvertent to the fact that the plaintiff made a statement on cross-examination as to a material matter, apparently in conflict with his evidence when examined in chief, but this affected his credibility only, and did not justify withdrawing his evidence from the jury. *Ward v. Mfg. Co.,* 123 N. C., 252." *Shaw v. Handle Co.,* 188 N. C., 236; *In re Fuller,* 189 N. C., 512.

Under all the facts and circumstances of the case, the defendant did not, as laid down in the *Horton case, supra,* 233 U. S., in "the extent of its duty to its employees see that ordinary care and prudence was exercised to the end that the place in which the work is to be performed . . . may be safe for the workman." *Southwell v. R. R.,* 189 N. C., at p. 420.

The court below charged the jury: "I am giving you this special instruction at the request of the defendant railroad company: 'If the jury shall find by the greater weight of the evidence that defendant has been guilty of actionable negligence, as heretofore defined in these instructions, then it will be necessary for you to consider what, if any, damages the plaintiff is entitled to recover. The rights and liabilities of the parties in this action are governed by an act of Congress known as the Federal Employers' Liability Act, and the amount of damages, if any, which may be recovered is fixed and limited by the provisions of that act as construed by the Federal Courts,'" etc. The court then gave defendant's request in its own language as to the measure of damages.

Under all the facts and circumstances of the case, both the direct and circumstantial evidence, we think that there was sufficient evidence to warrant the jury in finding that defendant was guilty of actionable negligence under the Federal Employers Liability Act. The general yardmaster at the Wilmington terminus knew, or in the exercise of reasonable care ought to have known, that the plaintiff's intestate, an engineer, had to pass out of the gate near his office about the time he approached the gate and was shot by defendant's employee, Dallas. By looking, there

was no obstruction, he could have easily been seen approaching the gate, for some distance by the yardmaster. The engineer came off his run and washed up and changed his clothes, and was approaching the gate, unarmed, with his engineer's bag in his right hand. The yardmaster knew Dallas, the employee under him, had a pistol. Dallas was in the passage way of the engineer going off duty and had had some previous difference with the engineer—known to the yardmaster. Immediately before Dallas shot the engineer he acknowledged the superiority of the yardmaster and addressed him as "Cap, all I want to do is to ask Southwell to lay off me and let me alone." The words "yardmaster" *ex vi termini,* indicate one in authority. The yardmaster had the authority to stop Dallas. The engineer, to go to and from his work passed in and out of the gate near the yardmaster's office. The yardmaster did nothing to restrain or stop his subordinate, with knowledge that Dallas was going to upbraid him, but allowed him, on the company's yard, as the engineer approached the gate exit, to shoot the engineer who was unarmed and on his way home. The engineer was "on duty" in defendant's enclosed yard. The employer is not an insurer and the care and diligence required in a particular case, the failure to exercise which is actionable negligence is that of an ordinarily prudent man under the same or similar circumstances. The evidence was sufficient to be submitted to a jury that defendant's company through its *alter ego,* the yardmaster, breached its duty to plaintiff's intestate.

We have carefully gone over the record and examined the assignments of error and see no prejudicial or reversible error. We examined defendant's able brief. The whole case is founded on whether there was sufficient evidence to be submitted to the jury as to actionable negligence. In the former case we thought there was (facts substantially the same) and we think the same in the present case. We can find

No error.