14441

JOHNSTON v. ATLANTIC COAST LINE R. CO.

(190 S. E., 459)

October, 1936.

*Messrs. Douglas McKay* and *Reynolds & Reynolds,* for appellant,

*Messrs. Epps & Epps,* for respondents,

March 2, 1937.

The opinion of the Court was delivered by MR. JUSTICE FISHBURNE.

This case arises under the Act of Congress fixing the liability of interstate railroads for injuries to their employees, and is determinable by its provisions (Federal Employers' Liability Act of April 22, 1908, c. 149, § 2, 35 Stat., 65, 45 U. S. C. A., § 52). The action was brought for the recovery of damages for the death of A. A. Wells, a fireman, while employed by the defendant and engaged in interstate commerce on a passenger train from Fayetteville, N. C., to Sumter, S. C. The deceased was instantly killed when the train on which he was working ran into an open switch leading into a wye track, about 1 mile and a half north of Bennettsville. The wreck occurred about 6 o'clock p. m., on the 2nd day of December, 1933. The train approached this point running at the rate of about 40 miles per hour, and at the switch left the main line, swung into the wye track, and was immediately derailed producing the fatality for which the suit is brought.

The switch had been unlocked and opened to the main line after dark by a Negro, Frank Easterling, who had stolen the switch key from W. L. Biggs, a relief agent of the defendant company, at Johns, N. C.

This theft, and the tragic sequence of events which followed it, resulting in the death of the fireman, present a most unusual state of facts.

Johns, N. C., is located on the branch line of the defendant railroad running from Fayetteville to Sumter, via Bennettsville. Biggs, the relief agent, operated at Johns a combination store and gasoline service station, which was broken open and robbed one night three or four days before the defendant's train was wrecked near Bennettsville. A bunch of keys belonging to Biggs, and the switch key, were kept in the store near the cash register, and were stolen by the thief, along with some cigarettes and various kinds of tobacco. The testimony is undisputed that the store was locked prior to the robbery, and that the robber had to break into the store in order to gain entrance. The Negro, Easterling, who robbed the store, freely testified at the trial as witness for the defendant. At the time he was serving a term in the State penitentiary for wrecking the train. He testified in detail as to the circumstances of the theft of the key and the use of it in opening the switch. He said that he broke into the store of Mr. Biggs and stole the key which was hanging by itself near the counter; that he did not know that it was a switch key, but on his way to Bennettsville several nights later he reached the railroad switch in question, and found that the key would fit the switch lock; that he unlocked it, opened the switch to the main line, and locked it back, and left it in that position, and then went up town and attended a picture show; that later the same night he heard about the wreck. He also said, "I tried to put the switch back like I found it, but I don't know."

The testimony shows that the switch key would open any switch lock on the line of the defendant company. The bunch of keys, including the switch key, were recovered from Easterling following his arrest.

The plaintiff made the following specifications of negligence: (1) In failing to use any switch lights or other adequate method that would give warning at night of an open

switch; (2) in failing to properly protect and safeguard the switch key; (3) in failing to take any precaution to protect the switch, or give warning when it knew that the key was in the hands of a felon.

The defendant pleaded that as to the acts of negligence alleged, the proximate cause of the injury was an act for which it was in no wise responsible, namely, the act of a trespasser or criminal, who, after breaking into the store of its relief agent, unlawfully and feloniously stole the switch key, along with other things, and opened the switch, which unlawful act was perpetrated a very short time before the arrival of the train on which plaintiff's intestate was fireman; and further pleaded that the plaintiff's intestate had assumed the risks, both usual and unusual, of his employment; had full knowledge of the nature and character of the construction of the switch and the switch stand, and the construction, nature, and maintenance of the switch target, and fully appreciated, acquiesced in, and assumed all risks connected therewith.

The testimony shows that the switch stand and signal target located at the point where the wreck occurred was standard equipment used by the defendant company, and stood 68 inches from the top of the target to the top of its base. The round disc of the target is 15 inches; the arrow, which is painted red, is 22 inches long, and 15 inches wide, and this target had been painted about two weeks prior to the wreck; that when the switch is open, or open to the main line, it shows the arrow which is painted red.

There was no light on the switch stand, but there was a place on the top for a light to be placed in a slot. The defendant company used no oil lights on the top of any of its switch stands on any of its branch lines, including the branch line from Fayetteville to Bennettsville, on which the wreck occurred; although some switch lights were used on its main line. At the time of the accident the train here in question was approaching a highway crossing located about 150

yards south of the displaced switch, and the whistle was blowing.

It is undisputed that the wye track, the entrance to which was gained by opening this switch, was used by only two trains in the daytime for the purpose of reversing their positions, and it was not used at all at night. The last train crew to use the wye track left it closed and locked, about 4 o'clock p. m., on December 2nd, the day of the wreck. The switch was not moved again until shortly after dark on that day, when the Negro who had stolen the key came along and unlocked it, throwing the wye open to the main line; and this occurred a very short period of time preceding the arrival of the train on which decedent was riding.

The trial resulted in a verdict in favor of the plaintiff.

The defendant appeals from the refusal of the trial Judge to direct a verdict in its favor on the ground that there was no evidence of actionable wrong on the part of the defendant company to warrant the submission of the issues to the jury; that the only reasonable inference to be drawn from the testimony was that the wreck, and the consequent death of plaintiff's intestate, were caused by the unlawful intervening acts of a third party; and that the evidence established that the plaintiff's intestate assumed the risk of his employment.

The respondent contends that the defendant company was negligent in the first instance in failing to properly protect and safeguard the switch key. A careful review of the evidence fails to disclose any reasonable basis for this charge, or any issue thereabout which should have been submitted to the jury. The key in question was in the possession of the defendant's authorized agent. It was kept by him in the locked storehouse, whence it was stolen by a Negro, who had to break into the store in order to get it.

Biggs, the relief agent, testified that it was his custom to leave this key locked up in his store, and that he had no reason to believe that the store was an unsafe place to keep the key. We see nothing in the evidence from which it can

be reasonably inferred that the conduct of the defendant in this respect was negligent.

But even if this were negligence, can it be said that the defendant company ought to have foreseen and anticipated the probable result of such negligence?

In order that the failure to properly safeguard the switch key should be regarded as negligence in this case, it must appear that the defendant company should have foreseen and anticipated, not only that a robber would break into the store in which the key was located, but that he would steal the key; would know that it was a switch key, and would thereafter commit the criminal act of unlocking one of the switches on its line. Such a conclusion, it seems to us, would be far fetched in the extreme, and would not only "practically stretch foresight into omniscience." *Gant v. Gant,* 197 N. C., 164, 148 S. E., 34, 35, but would in effect require the anticipation of "whatsoever shall come to pass," *Beach v. Patton et al.,* 208 N. C., 134, 179 S. E., 446, 447.

"The law only requires reasonable foresight, and when the injury complained of is not reasonably foreseeable, in the exercise of due care, the party whose conduct is under investigation is not answerable therefor. Foreseeable injury is a requisite of proximate cause, and proximate cause is a requisite for actionable negligence, and actionable negligence is a requisite for recovery in an action for personal injury negligently inflicted." *Osborne v. Coal Co.,* 207 N. C., 545, 546, 177 S. E., 796.

It is argued by the respondent, however, that following the theft of the key, the defendant must have known that it was dangerous to have one of its switch keys in the hands of a felon, whose only purpose in taking it would be to use it, and the only way in which he could use it would be to open a switch; and, further, that it was the duty of the defendant to give a general alarm of the likelihood of switches being opened, and to take immediate steps to apprehend the person who had stolen the key, and even to go so far as to have its police force patrol the tracks which led from Johns,

N. C., in order to prevent the thief from unlocking any switch on defendant's line of railroad.

If the conduct of the defendant thus complained of can be deemed negligence, which we do not find it necessary to pass upon, can it be said that such negligence was the proximate cause of the death of the plaintiff's decedent?

The leading case in this State upon the subject is *Harrison v. Berkley*, 1 Strob., 525, 47 Am. Dec., 578, where it is said: "It is, therefore, required that the consequences to be answered for, should be natural as well as proximate. (7 Bing, 211; 5 B. & Ad., 645.) By this, I understand, not that they should be such, as upon a calculation of chances, would be found likely to occur, nor such as extreme prudence might anticipate, but only, that they should be such, as have actually ensued one from another, without the occurrence of any such extraordinary conjuncture of circumstances, or the intervention of any such extraordinary result, as that the usual course of nature should seem to have been departed from."

In *Carter v. R. Co.*, 109 S. C., 119, 95 S. E., 357, 359, 11 A. L. R., 1411, which was a case of an attack upon a railroad station agent by a robber, due, as alleged by the plaintiff, to the defendant's negligence in failing to keep its station grounds properly lighted, the Court, in sustaining the direction of a verdict for the defendant, said: "The want of light was merely a condition which might or might not have influenced the intervening independent act of the robber, over whom defendant had no control. The authorities are practically unanimous in holding that, when the negligence alleged appears merely to have brought about a condition of affairs, or a situation under which another and entirely independent and efficient agency intervenes to cause the injury, the latter is to be deemed the direct or proximate cause, and the former only the indirect or remote cause."

The *Carter case* is reaffirmed in *Sandel v. State*, 115 S. C., 168, 104 S. E., 567, 13 A. L. R., 1268; *Miller v. R. Co.*, 140 S. C., 123, 138 S. E., 675.

As is stated in 1 Shear. & R. Neg. (5th Ed.) § 25: "The defendant's negligence may put a temptation in the way of another person to commit a wrongful act by which the plaintiff is injured, and yet the defendant's negligence may be in no sense a cause of the injury."

In *Martin v. Southern Ry.*, 77 S. C., 370, 58 S. E., 3, 5, 122 Am. St. Rep., 574, the Court said: "If there be an intervening cause, and the prior cause do nothing more than give rise to the circumstances under which the injury occurs, then such prior cause cannot be said to be the promixate cause." See, also, *Foster v. City of Union*, 129 S. C., 257, 123 S. E., 839; *Carter v. R. Co.*, 109 S. C., 119, 95 S. E., 357, 11 A. L. R., 1411; *State v. DesChamps*, 126 S. C., 416, 420, 120 S. E., 491; *Miller v. R. Co.*, 140 S. C., 123, 162, 138 S. E., 675.

The federal decisions, which are controlling in cases ■ arising under the Employers' Liability Act, are equally strong in support of the rule announced by our own decisions.

Mr. Justice Strong, discussing this question in *Milwaukee & St. P. R. Co. v. Kellogg*, 94 U. S., 469, 24 L. Ed., 256, said: "But it is generally held, that in order to warrant a finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances."

Even the severe rule of care and diligence which the ■ law imposes upon carriers of passengers does not extend so far as to make one liable for an injury to a passenger from an accident which is not the reasonable, natural, and probable result of the situation, and which could not have been foreseen by the carrier in the exercise of that degree of care which the law demands of him. 3 Thomp. Neg., §§ 27-78. The reason of the rule is that the law holds a person liable for those consequences only which were the

natural and probable result of his negligence, and which therefore ought to have been foreseen and anticipated.

The general rule of law is that if between the negligence and the injury there is the intervening crime or willful and malicious act of a third person producing the injury, but that such was not intended by the defendant, and could not have been reasonably foreseen by it, "the causal chain between the original negligence and the accident is broken." *Burt v. Advertiser Newspaper Co.,* 154 Mass., 238, 28 N. E., 1, 13 L. R. A., 97; *Chancey v. R. Co.,* 174 N. C., 351, 93 S. E., 834, L. R. A., 1918-A, 1070, Ann. Cas., 1918-E., 580; *Green v. Atlanta & C. A. L. Ry. Co.,* 151 S. C., 1, 148 S. E., 633; *Atlanta & C. A. L. R. Co. v. Green,* 279 U. S., 821, 49 S. Ct., 350, 73 L. Ed., 976; *Davis v. Green,* 260 U. S., 349, 43 S. Ct., 123, 67 L. Ed., 299; *St. Louis-San Francisco R. Co. v. Mills,* 271 U. S., 344, 46 S. Ct., 520, 70 L. Ed., 979; *Strong v. Granite Furniture Co.,* 77 Utah, 292, 294 P., 303, 78 A. L. R., 465, and annotation; *Atlantic Coast Line R. Co. v. Southwell,* 275 U. S., 64, 48 S. Ct., 25, 26, 72 L. Ed., 157.

In *Atlantic Coast Line R. Co. v. Southwell, supra,* which was a North Carolina case, the action was brought against the railroad company by the administratrix and widow of one of the defendant's employees, for the death of her husband by a murder which it was alleged that the petitioner "with gross negligence wilfully and wantonly caused, permitted and allowed."

The Supreme Court of North Carolina upheld a judgment for the plaintiff in the above case (*Southwell v. Atlantic Coast Line R. Co.,* 191 N. C., 153, 131 S. E., 670). The action was brought under the Federal Employers' Liability Act, and the question involved was whether there was any evidence that the death resulted in whole or in part from any negligence of any officer of the defendant under the law as applied by the Supreme Court of the United States, and the Court said in that case (*Atlantic Coast Line R. Co. v. Southwell,* 275 U. S. 64, 48 S. Ct., 25, 26, 72 L. Ed., 157):

"It would be straining the language of the Act somewhat to say in any case that a wilful homicide 'resulted' from the failure of some superior officer to foresee the danger and to prevent it .In this case at all events we are of opinion that there was no evidence that warrants such a judgment. It is not necessary to state the facts in detail. Those mainly relied upon are that Fonvielle, the general yardmaster, knew that Southwell, the man who was killed, on previous occasions had used threatening language to Dallas, who shot Southwell; that Fonvielle knew or ought to have known that they were likely to meet when they did; that Fonvielle was with Dallas, his subordinate, just before that moment and that Dallas said to him 'Cap, all I want to do is to ask Southwell to lay off of me and let me alone,' and that Fonvielle said that he must not see Southwell, that if he saw him and talked to him it might bring about unpleasant consequences; that Fonvielle left Dallas and after having gone a short distance saw him and Southwell approaching each other and had taken a few steps towards them with a view to separate them in case of an altercation, but that before he had time to reach them the shot was fired. Fonvielle knew that Dallas had a pistol, but there was a strike at the time. Dallas was a special policeman and had a right to carry it and not unnaturally did. The only sinister designs of which there is any evidence were of Southwell against Dallas, unless Dallas' remark just before the shooting be taken to foreshadow the event, which it certainly did not seem to until after the event had happened. It appears to us extravagant to hold the petitioner liable in a case like this. See *St. Louis-San Francisco R. Co. v. Mills*, 271 U. S., 344, 46 S. Ct., 520, 70 L. Ed., 979."

In the light of these decisions, state and federal, it is obviols that there is no continuity of causal connection between the defendant's failure to guard its switches or notify its train crews of the likelihood of switches being opened improperly or unlawfully on the one hand, and the ultimate wreck and injury on the other hand. The unlawful act of

the criminally minded Negro in opening the switch, broke the sequence, and intervened as an entirely independent and efficient agency. This act must be deemed the direct and proximate cause of the injury. The intervention of a third person and the commission of the crime which resulted in the death of the fireman was not a natural and probable consequence which might reasonably have been expected to result from the defendant's failure to guard the switches on its railway line, or to notify its train crews that the switches might be unlawfully tampered with. It is clearly to be deduced from the holdings in the cases decided by the United States Supreme Court, just hereinabove referred to, that the Federal Employers' Liability Act will not allow recovery, under the facts and circumstances appearing in this case, and it would be an idle gesture for this Court in the face of these decisions to decide otherwise. But aside from the holding of the United States Supreme Court in these cases, we are of the opinion that the evidence did not in any sense show circumstances sufficient to cause the defendant to reasonably foresee that the switch key would be improperly used by the person who stole it from the store of Mr. Biggs. See particularly the facts stated in the case of *Green v. Atlanta & C. A. L. Ry. Co.*, 151 S. C., 1, 148 S. E., 633, which case was reversed in *Atlanta & C. A. L. R. Co. v. Green*, 279 U. S., 821, 49 S. Ct., 350, 73 L. Ed., 976.

In this case there was no evidence that any other employee of the defendant had ever been previously injured under the circumstances shown here, and consequently if the loss of a switch key be deemed potentially dangerous, there was no notice of the previous hazard of the personal injury to trainmen. See *Ward v. Southern Ry. Co.*, 206 N. C., 530, 174 S. E., 443.

In other words, the mere theft of the switch key, along with the cigarettes and tobacco, standing alone, did not indicate the sinister purpose nor foreshadow the event. As later disclosed at the trial, the Negro, Easterling, was not even aware of the fact that he had stolen a switch key.

In its final analysis, this case presents an injury inflicted by the criminal act of a third person, and one in no wise connected with the operation of the train or the ordinary prosecution of the defendant's business.

As to the allegation of negligence, to the effect that the defendant did not equip its switch stands with oil lights, it was shown that nowhere on the defendant's branch lines were any such lights in use, and that the plaintiff's decedent had been working on the branch line from Fayetteville to Bennettsville for more than two years; was thoroughly familiar with the type of switch stand and target which was used; had full knowledge that the switch in question was not equipped with lights, and must be held to have assumed such risks. It would seem logically to follow that if no reason is disclosed by the evidence why the defendant should be held to have reasonably anticipated the criminal act of an independent third person, then there was no reason why the defendant would be under any obligation or duty to guard its tracks and switches or to notify its train crews of the probable improper use of the lost switch key.

In our opinion, the trial Judge should have granted the motion for a directed verdict, and that he erred in not doing so.

The exceptions are sustained, and the case remanded for entry of judgment in favor of the defendant under Rule 27.

MR. CHIEF JUSTICE STABLER and MR. JUSTICE BONHAM concur.

MR. JUSTICE CARTER dissents.

MR. JUSTICE BAKER did not participate.

MR. JUSTICE CARTER (dissenting) : I am unable to agree with the conclusion reached by the writer of the leading opinion in this case and, therefore, most respectfully dissent.

As I view the record in the case, there was competent evidence of actionable negligence to go to the jury. In this connection I call attention to the testimony tending to show that the defendant caused its train to be operated at the time

and place in question without a light upon its switch post, and that the failure to furnish such light made it dangerous for the intestate, and there being testimony tending to show that the failure to furnish such light was an act of negligence, the jury should have been permitted to have determined whether or not such negligence was the proximate cause of the intestate's death, the train in question having reached said place in the night time and there being no light at the place sufficient to guide the operation of the train or to enable those operating the train to see that the switch had been left open and that the place was dangerous where the wreck occurred. These acts should be considered in connection with the testimony tending to show the negligent way in which the key to the switch in question was handled. According to the rules of the company, introduced in evidence, it was the rule of the company to keep a close watch over the switch key and keep it in a safe place, but in the case under consideration, according to the testimony, the company failed to do that. It was also the rule of the company when a key was lost it must be immediately reported to the proper authority and it was also the rule of the company when a key was found it must be immediately turned in and reported. The testimony tends to show that this was not done by one of its agents, Mr. Biggs. It appears from the testimony that this gentleman was first given a key several years ago, which key he lost and which loss he failed to report to the defendant company. Thereafter, another key was lost on the yard at Johns and the witness McLaurin found this key and turned it over to Biggs, whose duty it was to turn the key over to defendant company. However, Mr. Biggs failed to perform his duty in this respect and kept the key. Instead of keeping the key in a safe place, Mr. Biggs negligently hung it up right by his cash register in a little store in Johns. As to what care was taken of the last-mentioned key, the testimony is in conflict. According to the testimony of Mr. Biggs, that key was kept along with his "bunch of keys", but the witness East-

erling testified that this key was kept alone and left hanging by the cash register. From all the testimony it appears that the building in which the key was left was an ordinary little building and the key could not be regarded as having been in a very safe place. The testimony further shows that Easterling broke into the store and stole the key about four days before the wreck in question. It was Mr. Biggs' duty to report this loss at once to the railroad company. There is no testimony tending to show that he complied with this rule. I find no testimony tending to show that the deceased was given any information about the key in question having been stolen from the place in question. He was required to go on with his work and lost his life in the performance of his duty when said train was derailed following the opening of the switch by Easterling who stole the key in question at the place above stated. I think the jury should have been permitted to have considered the testimony introduced and determined whether or not the negligent acts alleged and testified to caused the alleged death.

In my opinion, all exceptions should be overruled and the judgment affirmed.