12481

GREEN v. ATLANTA & C. A. L. RY. CO. *ET AL.*

(148 S. E., 633)

Remanded on Mandate June 10, 1929

*Messrs. Frank G. Tompkins,* and *DePass & Wrightson,* for appellants,

*Messrs. Lyles, Daniel & Drummond,* and *I. C. Blackwood,* for respondent,

July 7, 1928.

The opinion of the Court was delivered by Mr. Justice Stabler.

The plaintiff was a night yard conductor in the freight yards at Hayne, near the city of Spartanburg. On the night of February 27, 1922, while he was engaged in the performance of his duties as such yard conductor, he was shot by a gang of robbers, and was painfully and dangerously wounded. For damages for the injuries thus received, he brings this action, based upon certain alleged negligent acts of the defendants.

The complaint sets out that, prior to and on February 27, 1922, the plaintiff was employed by the defendant Southern Railway Company as a yard conductor, and was placed at work in its yards at Hayne on the line of the defendant Atlanta & Charlotte Air Line Railway Company, his duties being, in the course of his employment, to break up incoming freight trains left there and to make them up into outgoing freight trains for various points; that the defendants furnished him an unsafe place to work, in that "the vast accumulation of loaded freight cars in the Hayne yards and the storage of large quantities of freight in the transfer shed at Hayne operated as a great temptation to the evil-disposed, and induced thieves, robbers and desperadoes to frequent and resort to the said Hayne yards for the purposes of looting, thieving, robbing, car-breaking and the perpetration of all manner of kindred misdemeanors and felonies, and who were, as a rule, prepared and inclined to prevent detection and make sure escape at the cost of human life"; that "some time prior to February 27, 1922, the plaintiff complained to his superiors that, by reason of the increasing numbers of outlaws, thieves, and desperadoes that were beginning to accustom themselves to rendezvous in the yards for the purposes of pillage, thievery, car-breaking and robbery, it was becoming unsafe for the employees at work in the yards during the nighttime, and was advised that such unsafety was known, but would be remedied"; that the defendants kept an inadequate number of men on duty in the yards for the purpose of policing the same, "and by reason of the in-

adequacy, the outlaws frequenting the Hayne yards were encouraged and increased in number; that the plaintiff relied upon the assurance given when he complained that the matter would be corrected"; that about 11:30 on the night of February 27, 1922, while plaintiff was engaged in making up a freight train for Spencer, N. C., and beyond, he unintentionally surprised a gang of desperadoes, evidently engaged in car-breaking, who, upon his approach, opened fire upon him with pistols inflicting painful and serious gunshot wounds, from which he suffered serious operations, incurred heavy expenses, and sustained injuries of a permanent nature, etc.

By the thirteenth paragraph of his complaint, the plaintiff sets out the particular negligent acts of the defendants alleged to be the proximate cause of his injuries and sufferings:

"That the plaintiff's aforesaid injuries and sufferings were directly and proximately due to the negligence of the defendants in failing to provide the plaintiff with a safe place in which to do the work he was required to do in that:

"a. They knowingly caused and permitted the Hayne yards to become a resort for thieves and robbers, prepared and inclined to prevent detection and secure escape, by murder, if need be, the existence of such condition being directly due to the accumulation of vast numbers of loaded freight cars and vast quantities of valuable freight in said yards, and, by inaction, permitting it to be discovered by the evil-disposed that valuable property easy to be stolen and carried away was constantly and continuously being placed and kept throughout the great length of the Hayne yards in the nighttime in a situation that it could not be adequately guarded by a force of only three men.

"b. In failing to make reasonable provisions for even the protection of the property situated and kept in the yards, so as to discourage the would-be thieves and robbers, thereby emboldening them and increasing their number and activi-

ties, the failure to adequately protect the property resulting in directly hazarding the life and limb of every yard employee.

"c. In failing, after knowledge of unsafe conditions, to provide a proper police protection for the property and employees in the yards, their neglect in protecting the property directly operating as an invitation to the evil-disposed.

"d. In not providing a sufficient force of officers and agents to police the yards, protect the property and employees, and rid the situation of its characteristics, which may be phrased as an attractive nuisance to thieves, robbers and desperadoes.

"e. In not increasing the force of officers and agents, after knowledge of its inadequacy to protect employees and property in the Hayne yards, and after admitting such inadequacy and promising remedy, the Hayne yards being located outside of any municipally policed area.

"f. In not adequately providing for the lighting of said yards in the nighttime, the yards being very long and the numerous tracks for storage, etc., being practically parallel throughout the length of the yards, and being nearly always completely occupied by loaded freight cars, and there being only one line of lights in the yards, the said lights being arranged in a straight line and serving only to illuminate immediately beneath them and only the tops of the freight cars on either side, and serving only to deepen the shadow in which the outlaws might lurk and successfully conceal themselves, instead of serving to illuminate the yards, said line of lights being so placed as to cast shadows on either side and about the edges of the yards, thereby making it easy for outlaws both to approach and to leave the yards in the shadow, whereas the lights should have been so arranged as to surround the yards with a zone of illumination, and instead of being arranged in one continuous line, they should have been 'zig-zagged' or 'staggered,' so as to light all parts of the

yards, and should have been sufficient in number for that purpose."

The defendants pleaded: (1) A general denial; (2) assumption of risk by the plaintiff; (3) contributory negligence on the part of the plaintiff; (4) the benefit of the Federal Employers' Liability Act to the exclusion of all state laws, either common or statutory.

The case was tried in March, 1927, before Judge Townsend and a jury. On the trial, it was agreed that, when the plaintiff was shot and wounded, he and the defendants were engaged in interstate commerce, and the action was tried under the Federal Employers' Liability Act.

At the conclusion of the testimony, the defendants made a motion for a directed verdict; which was overruled. The jury found for the plaintiff in the sum of $20,000. The defendants appeal to this Court.

There are a number of exceptions, but the appellants state the questions raised by them to be only three. These we will discuss in order.

I. The first question is: "Was there sufficient evidence of negligence to require a refusal to direct the verdict and the submission of the case to the jury?"

This case has been before this Court twice before. The first appeal was from an order overruling a demurrer to the complaint (131 S. C., 124, 126 S. E., 441, 38 A. L. R., 1448); the second, from an order overruling a motion to strike out parts of the complaint and to make certain allegations of same more definite and certatin (135 S. C., 147, 132 S. E., 172).

On the first appeal, this Court held that the lower Court had properly overruled the demurrer, and that the complaint stated a cause of action. In considering the grounds of the demurrer, the Court said:

"Ordinarily, it may be conceded that the danger of injury to a servant from the illegal or criminal acts of independent third persons is not a danger of which the master in the dis-

charge of his duty to provide a safe place to work, etc., has such knowledge, or the opportunity to acquire knowledge, as would impose liability for such an injury. * * *

"But, where it appears that the master has actual knowledge of conditions within his control which conduce to expose a servant in the performance of the master's work to danger from the lawless acts of third persons, and that the intervention of such illegal acts of third persons is a consequence reasonably to be expected from the maintenance of such conditions a different case is presented. In the case at bar it is alleged that the conditions rendering the servant's place of work unsafe were 'knowingly' maintained; that defendants had actual notice of the danger from the intervention of the lawless acts of third persons; and that the unsafety of the place of work from that source was recognized by the defendants as a condition calling for remedial action. Proof of that state of facts would, we think, clearly warrant the inference that the lawless act of the third persons which resulted in injury to the servant was a consequence within the actual contemplation of the defendants and was not such a consequence as could not reasonably be expected to follow in natural and ordinary sequence from the original act or omission upon which the actionable negligence is predicated. If the intervention of the lawless acts of third persons was by virtue of the defendants' knowledge of the situation, a consequence reasonably to be expected, it was not a consequence too remote to entail liability, for 'that which is reasonably to be expected will be regarded (as both proximate and natural), although it may be considerably removed.' *Harrison v. Berkeley*, 1 Strob., 525, 549 (47 Am. Dec., 578). In that state of the facts there remains no tenable basis for a conclusion that, merely because the act which results in, or concurs as an efficient cause in producing, the injury was illegal in character, and was an act for which independent third persons were also liable as *tort-feasors,* the alleged negligence of the defendants was thereby insulated,

and the causal connection broken. If the intervention is reasonably to be expected, and hence is to be regarded as a natural and proximate consequence, the fact that it consists in wrongful misconduct for which third persons might also be held legally responsible furnishes no sound reason, as we apprehend, for declining to apply the logical and well-established doctrine that an intervening cause, brought to bear by an independent, responsible human agency, will not break the causal connection, if such intervening cause was induced, produced or set in motion by the negligence charged to the original wrongdoer. * * *

"Accepting at their face value the allegations of the complaint in the case at bar, the plaintiff's injury was both a natural and probable consequence which not only might reasonably have been expected to result from the alleged delicts of the defendants, but was actually recognized as a consequence so probable as to justify the promise of remedial action."

With respect to the question now under consideration, the appellants contend that, admitting the complaint states a cause of action as held by this Court on the first appeal, there was not, on trial of the cause, sufficient evidence of actionable negligence on the part of the appellants to require the submission of the case to the jury—in other words, that the respondent failed to prove the allegations of his complaint.

In the first place, the appellants argue that, this action having been brought under the Federal Employers' Liability Act, the rights and obligations of the parties in the case depend upon this Act of Congress and the principles of the common law as interpreted and applied by the federal courts; and that, under the law applicable, the evidence shown was not sufficient to sustain the finding that the carriers' negligence was the proximate cause of the injury, and a verdict should have been directed for them. In the same connection, they contend that, on the first appeal of the case to this Court, the question of the applicability of the Federal Employers' Liability Act was not raised.

The complaint, which was before the Court in its consideration of the demurrer, contains allegations showing that both the respondent and the appellants were engaged in interstate commerce at the time of the alleged accident. We think that, when the complaint was attacked for insufficiency, the question of whether a cause of action was stated under the law applicable was embraced in the question raised. But the point is immaterial, since we conclude that, under the construction of the Act as given by the federal courts, the evidence in this case was sufficient to sustain the verdict of the jury that the negligence of the appellants was the proximate cause of the respondent's injuries.

In the second place, the appellants say that the case should not have been submitted to the jury, for the reason that the testimony left uncertain whether the injury complained of resulted from appellants' negligence or from some independent cause, and was thus rendered a matter of conjecture or speculation not properly to be considered by the jury.

The trial Judge, in refusing to direct a verdict for the appellants, said:

"Well, I think there is some testimony tending to show that the conditions in the yard were such that it was within the range of probability that the workmen in the yard might get shot by some of these marauders, and is a question for the jury whether or not that such a probability should have been anticipated by the master and guarded against. The question of proximate cause is one peculiarly for the jury."

We have carefully read the testimony, and the following facts may be fairly inferred from same: That the yards where the respondent was working as a yard conductor were very large, and contained a great many tracks for the parking of freight trains, and also a shed for the storing of freight unloaded from any of these trains; that all freight going into the city of Spartanburg, or originating on or beyond either of the crossing main lines, and destined for any point on the other, had to lie over there; that at certain points woods were

close to the yards, this being true of the point where the plaintiff was shot. There was testimony tending to show that the yards were poorly lighted; that freight cars when brought in were placed upon the parallel tracks, and in this way formed intercommunicating passages; and that, by reason of these conditions, persons desiring to rob or commit other crimes were afforded an easy method of approach as well as an easy way of escape. The testimony further tended to show that the yards, at the time of the shooting of the respondent, and for a considerable time prior thereto, were a rendezvous for robbers, tempted and induced to resort there because of the opportunity for looting and thievery afforded them by the conditions; that the situation was dangerous to employees working at night because of the chance of contact with these criminals; and that, at the time the shooting occurred, the respondent, in the nighttime, was engaged in the performance of the usual duties required by his employment. The testimony also tended to show that this dangerous condition was known to the appellants, and that they failed to rectify it, either by properly policing the yards or by having same properly lighted, or by adopting and putting into effect any other remedy appropriate, under the circumstances, for the safety and protection of their employees. We think that the evidence was sufficient to warrant the submission of the case to the jury on the question of negligence.

II. The second question is thus stated: "Did defendants upon complaint promise remedial relief, and did plaintiff continue to work in reliance upon any promise made to him upon such complaint?"

The testimony tends to show that the freight yards where the respondent worked had become infested with robbers and thieves, and were thereby rendered unsafe and dangerous, especially to employees working there at night. The respondent, Green, testified that there was a growing epidemic of robbing on the yards; that thieves could be seen jumping out of the looted box cars and creeping in from the light of the

engines in the yards; that he told Kirby, who was the yard master and his immediate superior, about the condition in the yards—that the robbing condition was bad on the north yard, that they could see thieves jumping out of cars, and "in fact, it was getting to be a dangerous condition over there"; that Kirby replied he knew about the robbery, and would have it looked into; that he would take the matter up with Maxwell (the superintendent) or have it done himself; that he talked to Kirby about the matter at other times, and also reported the matter to Hunsucker, the night yardmaster, who told him he would leave a note for Kirby to see about it; that he also reported the matter to the railroad detective, Evans, who told him, about a month before he was shot, that he was after the situation, and was doing all he could in the matter, and, about two weeks before he was shot, that the bunch of thieves he had been complaining about had been captured. The plaintiff's testimony as to his report to Kirby and Kirby's promise to him was corroborated by another witness.

We think that, from the evidence, the jury might reasonably conclude that the appellants promised Green that the dangerous situation would be corrected, and continued to assure him that remedial relief would be given and that Green, relying on these promises, continued to work as a yard conductor, and was so doing at the time he was shot. The testimony on the points here raised was sufficient to require the submission of the question to the jury.

III. The appellants' statement of the third question is: "After discovering the danger, and that no remedial relief was being furnished, did the plaintiff assume the risk by remaining in defendants' employ?"

In this question the appellants assume that the respondent discovered (1) the danger, and (2) that no remedial relief was being furnished, and upon these assumptions base their contention that he assumed the risk by remaining in their employment.

It appears that the dangerous situation created in the freight yards by reason of the fact that it had become infested with thieves and robbers arose after the respondent's employment by the appellants as yard conductor and manifested itself some time before he was shot. There can be no doubt, nor is it disputed, that the respondent knew of this dangerous situation. However, the same cannot be said as to the assumption that he discovered that no remedial relief was being furnished. To the contrary, the evidence tended to show that the appellants repeatedly sought to impress upon the mind of the respondent that remedial measures would be and were being taken, and that, in fact, they assured him the dangerous situation had been relieved by the capture of the thieves themselves.

From the nature of the danger, the most effective remedial measures might be of a nature requiring secrecy and strategy and time for the accomplishment of the purpose sought, and might be known only to those actively engaged in putting them into effect. The jury might conclude, if they believed the respondent's testimony, that the appellants assured him from time to time, after his complaint, that they were continuously at work, as they might be guided by circumstance and opportunity to relieve the dangerous situation. It does not appear that the appellants promised to remedy the situation in any specified period of time, but it might be inferred from the testimony that they viewed the danger as one that might require considerable time in the correction, and that the plaintiff so understood their attitude and relied upon their repeated statements. At no time did the appellants indicate to him, by word or action, that they had done all they intended to do in remedying the dangerous situation. Certainly, the respondent was in no position to know of his own knowledge whether any remedial measures were being taken, and under the circumstances he had a right to rely upon any representations with respect to the matter made to him by those in authority or responsible for correcting the condition.

As stated by the trial Judge, assumption of risk is an affirmative defense, and should not be taken from the jury where more than one inference can be drawn from the testimony. Under the evidence in this case, it cannot be said as a matter of law that the respondent assumed this extraordinary risk, and the question was properly submitted to the jury.

We have examined the cases from other jurisdictions cited by the appellants in support of the several questions raised and argued by them. No one of these cases, however, presents facts so analogous to those of the present case as to render it controlling. The same may be said of our own case of *Carter v. Atlantic Coast Line R. Co.,* 109 S. C., 119, 95 S. E., 357, 11 A. L. R., 1411, particularly relied on by the appellants. As stated by the Court in the first appeal of this case, the facts involved in the *Carter case* are essentially different from the facts of the case at bar.

On motion of the defendant for a directed verdict, the evidence, together with all inferences which the jury could justifiedly draw therefrom, must be considered most favorably to the plaintiff in determining whether the motion should be granted. *Crews v. Sweet,* 125 S. C., 303, 118 S. E., 613, 29 A. L. R., 43; *Green v. Atlantic Coast Line R. Co.,* 136 S. C., 337, 134 S. E., 385; *Ashe v. Southern R. Co.,* 104 S. C., 414, 89 S. E., 482; *Templeton v. Charleston & W. C. R. Co.,* 117 S. C., 44, 108 S. E., 363. And, where more than one inference can be drawn from the testimony, the case must be submitted to the jury. *Kell v. Fertilizer Co.,* 123 S. C., 199, 116 S. E., 97.

All exceptions are overruled, and the judgment of the Circuit Court is affirmed.

MR. CHIEF JUSTICE WATTS, and MESSRS. JUSTICES BLEASE and CARTER concur.

MR. JUSTICE COTHRAN (dissenting) : The plaintiff, a yard conductor, was shot by one of a gang of car robbers who were surprised by him in their enterprise. The question to be

decided upon this appeal is whether or not, under the circumstances *proved,* not simply *alleged,* the employer of the plaintiff is responsible to him in damages for the injury thus sustained.

I emphasize the necessity of *proof* rather than *allegation,* for the reason that the decision of this Court upon a former appeal (131 S. C., 124, 126 S. E., 441, 38 A. L. R., 1448) was rendered upon the review of an order of the Circuit Court overruling a demurrer to the complaint in which there were allegations of facts held sufficient to withstand a demurrer. I call attention to this fact, lest it be considered that the former decision has concluded the defendants in the present appeal. The decision has simply declared the legal consequences of certain alleged and admitted facts; that is, facts legally admitted by the demurrer; leaving open the main issue now presented, whether *the evidence* tends to sustain the allegations of the complaint.

There are nominally two defendants in the case, Southern Railway Company, lessee, and Atlanta & Charlotte Air Line Railway Company, lessor. It will be convenient to refer to both defendants as the railroad company, defendant.

It is conceded that the railroad company and the plaintiff were both engaged, at the time of the injury, in interstate commerce, and that the applicable law is the Employers' Liability Act of Congress and the federal decisions upon the subject.

In the case of *New Orleans & N. E. R. Co. v. Harris,* 247 U. S., 367, 38 S. Ct., 535, 62 L. Ed., 1167, the Court said:

"In proceedings brought under the Federal Employers' Liability Act, rights and obligations depend upon it and applicable principles of common law as interpreted and applied in federal courts."

In *Chicago, M. & St. P. R. Co. v. Coogan,* 271 U. S., 472, 46 S. Ct., 564, 70 L. Ed., 1041, the Court said:

"The rights and obligations of the petitioner depend upon the Act and applicable principles of common law as interpreted by the federal courts. The employer is liable for injury or death resulting in whole or in part from the negligence specified in the Act; and proof of such negligence is essential to recovery. The kind or amount of evidence required to establish it is not subject to the control of the several States. This Court will examine the record, and if it is found that as a matter of law, the evidence is not sufficient to sustain a finding that the carrier's negligence was a cause of the death, judgment against the carrier will be reversed."

The setting of the case is as follows:

At Hayne, S. C., about two miles south of Spartanburg, there is maintained and operated a very large freight yard, where through freight trains are made up, and also where through freight trains are brought to be broken up and made into new trains, to distribute freight bound toward Asheville, Columbia, Atlanta, Salisbury, Spencer, and other points, and where large numbers of loaded freight cars accumulate and lie over, pending the breaking up and remaking up of trains; a transfer shed in connection with said yard is maintained and operated, where valuable freight, in less than carload lots, is unloaded and stored, to be reloaded for shipment to ultimate destinations; the yard is very long and wide, having several lead tracks for the making up and breaking up of trains, with bad order, storage, shifting tracks, and crossovers, necessary and proper to the operation of the yard.

On and prior to February 27, 1922, the plaintiff was employed by the defendant Southern Railway Company as a yard conductor in said yard, where it was his duty, in the course of his employment, to break up the incoming freight trains left there for that purpose, and to make them up into outgoing freight trains for the various points, in all directions; frequently plaintiff's tour of duty fell in the nighttime, the work of making up and breaking up the trains in the yard being continuous throughout day and night.

The plaintiff was accustomed to begin work at 4 p. m. and continue until about midnight; on the night of February 27, 1922, at about 11 :30 p. m., while engaged with what was designated the south lead engine, on the south lead track, he was directed by the yard master to take his engine to track 14, in the north yard, and pick up certain cars on that track destined to northern points; he backed down through track 11, crossed over below the shed, and entered track 14, coupling the engine to the cars on that track which were to be moved; he and a switchman, Milan, then, for some reason not explained, left the engine and the others of the crew where it was standing on track 14, and proceeded to walk towards the south, between tracks 14 and 15; there were cars standing at the time on track 15 (to his left as he walked), and an opening had been left between two of them; the plaintiff saw a man jump from a car on track 15, on the opposite side from where he and Milan were walking; the plaintiff crossed over track 15, through the opening between the cars, and saw the man crouched down in the shadow of a car on track 15; he saw him preparing to shoot, and attempted to avoid his fire by getting between the two cars on track 15, but was not quick enough; the robber fired, striking the plaintiff in the hip, inflicting a serious wound, the basis of this action; the robber escaped out through track 14, and the plaintiff, who had fallen, was cared for by the yard engine crew.

The complaint is thus analyzed by this Court in the opinion upon the former appeal:

"The complaint, in substance, alleges that the defendants provided the plaintiff, employed as a yard-conductor, with an unsafe place to work, in that the place of work, a freight railroad yard, was a customary resort for thieves and robbers, induced and caused to resort there by conditions within the control of the defendant, and by them negligently maintained; that the plaintiff, while in the discharge of his duty in the nighttime, at the place of work provided, unintentionally surprised a gang of desperadoes engaged in car-breaking and

robbery, and was by them shot and seriously wounded; that prior to the date of his injury, the plaintiff had complained to his superiors of the dangers to which employees were exposed by reason of thieves and outlaws making of his place of work a customary rendezvous for purposes of pillage, etc., and 'was advised that such unsafety was known but would be remedied'; that plaintiff's injury was caused by the negligence of the defendants in failing to remove or correct the conditions which made the place of work a resort for outlaws and unsafe on that account, and in failing to provide the place of work with adequate police protection."

The allegations of the complaint were, of course, admitted by the demurrer, and the elements contained in the complaint which saved it from a demurrer were thus stated by the Court:

"Ordinarily, it may be conceded that the danger of injury to a servant from the illegal or criminal acts of independent third persons is not a danger of which the master in the discharge of his duty to provide a safe place to work, etc., has such knowledge, or the opportunity to acquire knowledge, as would impose liability for such an injury. If so, *a fortiori*, the master is not ordinarily bound to anticipate such intervention, and is under no obligation to exercise care to provide against dangers from that source. And that is true, even though 'the defendants' negligence may put a temptation in the way of another person to commit a wrongful act, by which the plaintiff is injured.' " Shearman & Redfield on Negligence (5th Ed.) § 25.

"But, where it appears that the master has actual knowledge of conditions within his control, which conduce to expose a servant in the performance of the master's work to danger from the lawless acts of third persons, and that the intervention of such illegal acts of third persons is a consequence reasonably to be expected from the maintenace of such conditions, a different case is presented. In the case at bar it is alleged that the conditions rendering the servant's place of

work unsafe were 'knowingly' maintained; that defendants had actual notice of the danger from the intervention of the lawless acts of third persons; and that the unsafety of the place of work from that source was recognized by the defendants as a condition calling for remedial action. Proof of that state of facts would, we think, clearly warrant the inference that the lawless act of the third persons, which resulted in injury to the servant, was a consequence within the actual contemplation of the defendants, and was not such a consequence as could not reasonably be expected to follow in natural and ordinary sequence from the original act or omission upon which the actionable negligence is predicated. If the intervention of the lawless acts of third persons was, by virtue of the defendant's knowledge of the situation, a consequence reasonably to be expected, it was not a consequence too remote to entail liability, for 'that which is reasonably to be expected will be regarded (as both proximate and natural), although it may be considerably removed.' "

The Court has thus decided, *in this case,* that the plaintiff's alleged cause of action for damages resulting from an injury inflicted upon him, not by the railroad company or any of its agents, but by a car breaker and robber, an independent, voluntary, human agency, may exist upon the establishment of the facts: (1) That the insufficient lighting and policing of the Hayne yard supplied the opportunity and inducement to car robberies; (2) that the railroad company was informed of this condition and its natural results; (3) that, by reason of the disposition of robbers of cars, prepared and inclined to prevent detection, interruption, and apprehension by murder, if necessary, the place in which the plaintiff was put to work was unsafe; (4) that the railroad company had actual notice of the danger to its employees from the lawless acts of third persons; (5) that the unsafety of the place of work, for these reasons, was recognized by the defendant as a condition calling for remedial action.

In other words, that, if these facts be established, the conduct of the defendant company will be held to have subjected

the interest of the plaintiff to a hazard against which he was entitled to protection, under the reasonably safe place rule.

The liability of a master for damages on account of a personal injury sustained by a servant, while acting within the course of his employment, as a result of the alleged negligence of the master in not providing him with a safe place in which to work, depends upon a solution of the following questions:

(1) Did the servant at the time of his injury have an interest which was entitled to the protection of the master?

(2) Did the conduct of the master subject the interest of the servant to a hazard against which the rule of a reasonably safe place to work, invoked by him, required protection?

(3) Could the harm to the plaintiff's injured interest have been reasonably anticipated by the master, at the time and as a consequence of the conduct complained of, as probable, by a person of ordinary prudence, situated as was the defendant; that is, can such conduct be deemed negligence?

(4) If the conduct of the defendant complained of can be deemed negligence, can it be said that such negligence was the proximate cause of the injury sustained by the servant?

## I

*Did the servant at the time of his injury have an interest which was entitled to the protection of the master?*

In every case of injury caused by the unsafety of the place in which he was required to work, the right of the servant to protection, under well-established principles, and the correlative duty of the master, are perfectly plain; the servant is entitled to require of the master the exercise of reasonable care to provide and maintain the place of work in a reasonably safe condition. Under the admitted facts of the case, this question is easily soluble in favor of the servant, and may not be further considered.

## II

*Did the conduct of the master subject the interest of the servant to a hazard against which the rule of a reasonably safe place to work, invoked by him, required protection?*

In the present case, *the interest* of the servant which was entitled to protection was immunity from personal injury which might result from a breach of the master's duty in regard to a safe place to work; *the hazard* which he actually encountered was being shot by a car robber whose operations were disturbed by his accidental presence, and who shot while attempting to escape and while being pursued by the servant; *the rule* invoked by the servant is the common-law rule which requires the master to exercise reasonable care in providing the servant with a reasonably safe place to work; *the conduct* of the master, which is asserted to have constituted a breach of that rule and duty, is the omission to sufficiently light and police the yard.

The issue, *eo limine* is whether or not that *conduct* subjected the *interest* of the servant to a *hazard* against which the *rule* required protection.

As is said by Prof. Green of Yale University in his learned treatise, "Rationale of Proximate Cause," p. 66:

"This is not saying that as a matter of fact there was a hazard, or that defendant violated the rule, for these are matters of fact for the jury. It is merely saying that, assuming the hazard and the violation of the rule, the Court must of necessity determine whether such a period is protected by the rule *under any circumstances*—a matter of defining the limits of the rule, or the protection afforded by it.   *   *   *   It is a problem solely for the judge."

(Note.—I have underscored the words "under any circumstances," for the purpose of suggesting that they should more accurately have been, "under the circumstances of the particular case." The issue presented to the judge would arise upon a demurrer to the complaint, upon a motion for a nonsuit, or upon a motion for a directed verdict, when the question would naturally be whether *the circumstances of the particular case* afforded any evidence tending to show that the hazard *actually incurred* was protected against by the rule invoked.)

It will be observed that nowhere in the evidence does it appear that it was the duty of the yard conductor, who was engaged in directing the movement of cars from one part of the yard to another, to apprehend thieves engaged in breaking into and robbing cars; the plaintiff does not pretend to claim that such was his duty, or that at the time he was shot he was attempting to apprehend the fleeing thief. His duties appertained to the movement of cars, making up trains, not the detection or apprehension of thieves. He happened to pass near the car which was being robbed; saw a negro jump from it, and crossed the track for the purpose of identifying him or of seeing the direction he took.

If, therefore, the plaintiff was not at the time engaged in a duty imposed upon him by his employment, it cannot be assumed that the master owed him the duty of making safe the place where he could not have been required or even expected.

The authorities universally hold that the place as to which complaint is made must have been a place provided by the master for the service. It cannot be assumed simply from the fact that a servant was injured at a particular place, which the result shows to have been a place of danger, that that was the place provided by the master for him to work; particularly in view of the positive evidence in the case that there were other places perfectly safe.

In *Broadway, etc., Co. v. Render* (Ky.), 119 S. W., 198, it is said:

"The duty of the master to furnish a reasonably safe place applies only to the place which the employe is *required to use* for the purpose of performing his duty."

In *Harper v. R. Co.,* 131 Ky., 225; 115 S. W., 198, it is said:

"But the duty of furnishing reasonably safe appliances and reasonably safe places and premises is confined to the appliances and places and premises with which the servant is *required to work, or in which his duties require him to be.*"

In *Smith v. Trimble* (Ky.), 64 S. W., 915, the Court said:

"And when appellant, without invitation or knowledge of the owner, went into or upon other parts of the premises, not necessary for the performance of his labor, he assumed all the risks of doing so. He was neither required, expected nor allured to be at the place where he was injured, and consequently appellee was under no duty to him to provide there a place of safety."

In *Albert v. McKay & Co.*, 174 Cal., 451; 163 P., 666, the Court said:

"The negligence charged in the first count is the failure to comply with the employer's duty to furnish his employe with a reasonably safe place to work. The duty is limited to *'the premises where the employe is required, for the purposes of his employment, to be.'* "

In *Harris v. Det., etc.,* 75 N. J. Law, 861; 70 A., 155, the Court said:

"A master's duty in respect to furnishing his servants a safe place in which to work extends to such parts of his premises only as he *has prepared for their occupancy* while doing his work, and to such other parts as he knows or ought to know they are accustomed to use while doing it."

"The duty of a master to furnish a safe and suitable place for his servants to do their work in extends only to such portions of the premises *as he has prepared and designed for their occupancy* while doing his work, and to such other parts as he knows, or ought to know, they are accustomed to use while doing it." *Morrison v. Burgess, etc., Co.,* 70 N. H., 406; 47 A., 412; 85 Am. St. Rep., 634.

"A master's duty to furnish his servant with a safe place in which to work extends to such parts of his premises only *as he has prepared for their occupancy* while doing their work, and to such parts as he knows or ought to know, they are accustomed to using while doing it." *Triangle Co. v. Acree,* 112 Ark., 534; 166 S. W., 958, Ann. Cas., 1916-B, 773.

"A master's duty in respect to furnishing his servant with a safe place in which to work, extends to such parts of his

premises only *as he has prepared for their occupancy* while doing their work, and to such parts as he knows or ought to know they are accustomed to using while doing it." La Batt (1st Ed.), § 1558b.

"The employer is not an insurer of the employee's safety. He is liable for the consequences of his negligence but not of the dangers of the employment." 39 C. J., 260.

Furthermore, as the incident could not reasonably have been anticipated, the master was under no obligation to make the place safe from the independent criminal act of a robber.

It may be that, if the railroad company was negligent in its duty to sufficiently light and police the yard, the darkness and absence of guards would supply the opportunity and inducement to the increased activity of the thieves; it would doubtless account in a measure for their presence in the yard for purposes of robbery; but, notwithstanding such opportunity and inducement, it required the voluntary, independent volition of the thieves to enter, with the determination to kill, if necessary, to effect escape—matters which must have been reasonably anticipated by the company in order to charge it with the duty of protection against them.

Granting that the yard was insufficiently lighted and policed, that, as a consequence, train robbers were afforded a better opportunity, and were thereby induced, to increase their activities, and that the railroad company had notice of these facts, it does not by any means follow that, if detected, they would shoot to kill, in order to avoid interruption, detection, or apprehension. To one not accustomed to such practices, it would seem that the immediate impulse would be to escape, *a course more readily available to the thief by the very circumstances complained of by the plaintiff, the insufficiency of lights and policing.* The evidence shows that this is the very course adopted by the thief upon the occasion in question; he jumped from the car upon the approach of the plaintiff and his companion, ran as fast as he could, and hid himself in the shadow of a box car on track 15. The fact, if it be a fact, that

the yard was insufficiently lighted and policed, not only induced greater activity on the part of car robbers, but it gave them assurance that they could the more readily escape without detection; it negatived, rather than tended to establish, the disposition to shoot in order to avoid apprehension.

It might with some force be argued that, if the thief had been cornered in the act of pillaging, and his only escape was "to shoot his way out," that would have been a result natural and probable from the detection and "hemming in"; but that is not what occurred—*he was trying to escape, and was concealing himself in the shadows,* as the plaintiff crossed track 15 between two cars to get a view of him as he fled.

It is alleged in the complaint, admitted by the demurrer, passed upon in the former appeal, and commented upon by the learned justice who voiced the decision of the Court, *that the danger from the lawless acts of marauders was communicated to the railroad company so constantly and vigorously as to evoke a promise of remedial action which was neglected.* The *evidence* shows that, naturally, it was the duty of the yard conductor to report to the yardmaster instances of car robberies that came to his attention, and that the assurance was given him that every effort was being made, and would be made, to put a stop to it—a very natural disposition on the part of the company. *No intimation appears to have been communicated to the company that the personal interests of the employees were jeopardized by such practices;* and the fact that both the plaintiff and the switchman, Milan, crossed over track 15, in the supposed danger zone where the culprits were fleeing, shows that they considered the danger, even of that course, insignificant.

It is exceedingly questionable whether the Employers' Liability Act covers a case of an intervening, willful assault upon a servant by a third person. The act allows a recovery when the injury to the servant has *resulted* from the negligence of the master, in whole or in part. In the case of *Atlantic Coast Line v. Southwell,* 275 U. S., 64; 48 S. Ct., 25; 72 L. Ed., 157,

decided by the Supreme Court of the United States October 31, 1927, it was sought to hold the railroad company liable for the homicide of the intestate by another employee, upon the ground that the superintendent could and should have prevented the killing. The Court, reversing the Supreme Court of North Carolina, which sustained a judgment for the plaintiff, observed:

"It would be straining the language of the Act somewhat to say in any case, that a willful homicide 'resulted' from the failure of some superior officer to foresee the danger and to prevent it."

There can be no difference between a successful willful attack and one which falls short of homicide, as in the case at bar.

I cannot say that that tribunal will crystallize the foregoing suggestion into law, but it, at least, indicates clearly that the injury must *directly result* from the alleged negligence of the railroad company.

### III

*Could the harm to the plaintiff's injured interest have been reasonably anticipated by the master, at the time, and as a consequence of the conduct complained of, as probable, by a person of ordinary prudence; that is, can such conduct be deemed negligence?*

Admitting that the first question above stated should be solved in favor of the plaintiff, if the second question should be solved in favor of the defendant, the case comes to an end. This result may be reached by holding either that under no circumstances, as suggested by Prof. Green, or under the circumstances of this particular case, the evidence does not tend to show that the hazard actually incurred by the plaintiff was protected against by the rule of safe place invoked.

But, if it should be held that the issue under the second question should be solved in favor of the plaintiff, the third question arises, upon the determination of which the exist-

ence of *actionable negligence* on the part of the defendant depends.

If the only inference reasonably to be drawn from the evidence is that it could not have been, it became the duty of the judge to so declare, and to direct a verdict for the defendant, *for then there would have been no actionable negligence on the part of the defendant railroad company.*

In order that the omission to supply sufficient light and policing for the yard should be regarded as negligence so far as the injury to the plaintiff is concerned, it must appear that the company should have anticipated, not only that robbers would be induced thereby to greater activity, but that, if detected, they would shoot to kill, and, if one of their number, fleeing, should be pursued by an employee who had other business to attend to, he would shoot; a conclusion which appears far-fetched in the extreme.

The question of negligence having been eliminated by the conclusion that the defendant, as a person of ordinary prudence, could not have reasonably anticipated the harm which actually occurred to the plaintiff's interest, the much-discussed and much-confused issue of proximate cause becomes no longer a controvertible or even a discussible one; *for that issue arises only upon the assumption that the prime act was a negligent act.*

As is said in the case of *Milwaukee & St. P. R. Co. v. Kellogg,* 94 U. S., 469; 24 L. Ed., 256, largely quoted:

"The question always is, was there an unbroken connection between the *wrongful* act and the injury—a continuous operation? Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between *the wrong* and the injury?"

See, also, where emphasis is laid upon *the wrongful or negligent character of the prime act, Goodlander Mill Co. v. Standard Oil Co.* (C. C. A.), 63 F., 400; 27 L. R. A., 583. *Cole v. German Society* (C. C. A.), 124 F., 113; 63 L. R. A.,

416. *Jarnagin v. Travelers' Protective Ass'n* (C. C. A.), 133 F., 892; 68 L. R. A., 499. *Travelers' Ins. Co. v. McConkey*, 127 U. S., 661; 8 S. Ct., 1360; 32 L. Ed., 308.

Much confusion, as pointed out by Prof. Green, has been caused by assuming that the prime cause was an act of negligence, passing over the important issue of whether it was or not, and making causation determinative of that issue. He illustrates the point as follows, at page 78:

"In *Sharp v. Powell,* defendant washed a van in a public street. The water ran down the gutter to a grating leading to a sewer. The grating being frozen over the water spread over a portion of the street and froze. Defendant was not shown to have known that the grating was obstructed. Plaintiff's horse while passing over the place slipped on the ice and broke its leg. Grove, J., said: 'I think the act of the defendant was not the ordinary or proximate cause of the damage to the plaintiff's horse, or within the ordinary consequences which the defendant may be presumed to have contemplated, or for which he is responsible. The damage complained of was not proximately caused by the original wrongful act of the defendant.'

"It would be difficult to imagine a clearer case of causal relation. But this was not the problem. There was merely no basis for finding that defendant should have anticipated as a probable result of his act any harm to plaintiff's interest which was in fact injured. This issue would have been for the jury but there was no evidence of negligence. It was the Judge's function here to direct a verdict for lack of evidence. But as has been done in numerous cases, the judge assumed defendant's conduct to be wrongful and then denied causal connection between the act and the hurt. He erred in both particulars."

## IV

*If the conduct of the defendant complained of can be deemed negligence, can it be said that such negligence was the proximate cause of the injury sustained by the servant?*

The incidents from which the plaintiff seeks to establish the "chain of causation" between the alleged prime act of negligence on the part of the defendant and the injury which he sustained are as follows: (1) The prime act of alleged negligence on the part of the defendant in the omission to sufficiently light and police the yard; (2) the consequent temptation and inducement to increased activity of car breakers; (3) the entry of the robbers into the yard for the purpose of pillage; (4) the alleged disposition of such criminals to kill in order to escape detection and apprehension, which constituted a menace to the yard employees, of which the company was informed and promised remedial action; (5) the act of car breaking; (6) the accidental presence of the plaintiff near the scene of the robbery; (7) the fright and flight of the robbers; (8) the pursuit of a fleeing robber by the plaintiff; (9) the felonious attack by the robber upon the plaintiff.

As a matter of course, if it be shown that there intervened between the prime act of negligence and the injury *an act which was not the proximate result of the prime act,* and which is relied upon as a link in the chain, the chain is broken, relieving the prime act from the imputation of the proximate cause of the injury.

The very first act, following the alleged negligence of the defendant, upon which the plaintiff relies as the immediate connecting link, the entry of the car breakers into the yard for the purpose of pillage, fails to perfect the connection.

Assuming that the alleged failure of the defendant to take the precautions of lighting and policing afforded an opportunity and an inducement, a temptation, for such entry, the alleged negligence could not possibly have resulted in injury to the plaintiff, if it had not been for the intervening criminal purpose and act of the car thieves.

Reason and authority unite in support of the proposition that, if the negligent act of the defendant has simply presented the opportunity and inducement, temptation, for the independ-

ent criminal act of a third person, such criminal act becomes the proximate cause of the injury, and the first negligent act merely a remote cause.

In *Carter v. R. Co.*, 109 S. C., 119; 95 S. E., 357; 11 A. L. R., 1411, which was a case of an attack upon an agent by a robber, due as alleged by the plaintiff to the defendant's negligence *in failing to keep its station grounds properly lighted*, the Court, in sustaining the direction of a verdict for the defendant, said:

"The want of light was merely a condition which might or might not have influenced the intervening independent act of the robber, over whom the defendant had no control. The authorities are practically unanimous in holding that, when the negligence alleged appears merely to have brought about a condition of affairs, or a situation under which another and entirely independent and efficient agency intervenes to cause the injury, the latter is to be deemed the direct or proximate cause, and the former only the indirect or remote cause."

The *Carter case* is reaffirmed in *Sandel v. State*, 115 S. C., 168; 104 S. E., 567; 13 A. L. R., 1268. *Miller v. R. Co.*, 140 S. C., 123; 138 S. E., 675.

As is stated in 1 Shear. & R. Neg. (5th Ed.), § 25:

"The defendant's negligence may put a temptation in the way of another person to commit a wrongful act by which the plaintiff is injured, and yet the defendant's negligence may be in no sense a cause of the injury."

"Whenever a new cause intervenes, which is not a consequence of the first wrongful cause, which is not under the control of the wrongdoer, which could not have been foreseen by the exercise of reasonable diligence by the wrongdoer, and except for which the final injurious consequences would not have happened, the second cause is regarded as the proximate cause and the other as the remote cause." 22 R. C. L., 132, citing many cases.

It might as well be said that the act of a storekeeper, in leaving the front door of his store unlocked, *caused* the entry of

burglars, and would render him liable in damages to a police-man injured in arresting the burglar who had taken advantage of the negligence of the storekeeper; or to a clerk who may have been in the store and who attempted to thwart the pur-pose of the burglar; or that, after numerous bank robberies had been committed in a community, the failure of the bank officials to employ special detectives, armed with machine guns to protect the employees, *caused* the entry of bank bandits, and would render the bank liable in damages to one of the em-ployees who had been shot by one of the robbers as he was making his escape.

The next easily frangible link in the chain is that the car breakers "were *as a rule,* prepared and inclined to prevent detection and make sure escape at the cost of human life"; that the employees of the company at work in the yard were in danger from the intervention of the lawless acts of third persons, robbers.

Of this allegation there is not a particle of evidence. All is left to the unaided impressions of the Court as to the character and disposition of that despicable class—the coyotes of the human race, whose customary means of defense are flight and concealment, and, with the race to which these culprits be-longed, their nocturnal protective coloring.

The next is the alleged notice and knowledge of the railroad company of the danger to which the employees in the yard were subjected from probable attacks by these night maraud-ers. Of this there is no evidence, as I have endeavored to show above. It is a matter of common occurrence for bank bandits to go prepared and with the determination to clear their way of escape with bullets. Such exploits are confined to a class to which car breakers and sneak thieves do not belong; their movements are swift and noiseless; their reliance for safety upon flight or concealment, not attack.

It seems to me that it would be much more reasonable to hold a bank which had taken no precautions against a "hold up" by bank robbers liable in damages to an employee injured

in such an enterprise; and yet, in the hundreds of such occurrences, I have never heard of an attempt even being made to do so.

I think, therefore, that the chain has snapped at its second link.

But assume that the company was negligent in not adequately lighting and policing the yard, that that negligence was the proximate cause of the entry by the thieves into the yard for the purpose of car breaking and pillage; that they were prepared, and intended to kill, if their enterprise should be interrupted, and that the company was notified of these facts, constituting a danger to its employees against which it should have afforded protection—I think that the voluntary act of the plaintiff, uncalled for by any duty imposed upon him, apparently from motives of curiosity merely, after the original alleged negligence of the company had expended itself, was such an intervening act as broke the connection between the defendant's act and the injury which the plaintiff sustained.

If it be true, as contended by the plaintiff, the very foundation of his claim, that the yard was so inadequately lighted as to make escape easy, his attempt to pursue the fleeing robber was both useless and foolhardy. He saw the negro jump out of a box car and run; the negro must have seen him, or he would not have run; the period of interruption, which is alleged to have provoked the intention to kill, had passed; if the negro had been allowed to run, no harm would have come to the plaintiff. But the plaintiff projected himself into a situation which had been relieved of the danger of which he complains; the subsequent danger was one of his own making, and cannot therefore be charged as a consequence of the alleged connected preceding events. How different the facts appear from the allegation of the complaint: "* * * The plaintiff unintentionally surprised a gang of desperadoes, evidently engaged in carbreaking and robbery, who upon his approach and their apparent inevitable discovery, opened fire," etc. This

is the theory upon which the Court sustained the order over-ruling the demurrer. Instead of showing that the robbers opened fire when they were surprised and about to be "inevi-tably discovered," the evidence shows that the robber had fled, and only shot after the plaintiff had projected himself into the new situation. His foolhardness is shown by his pursuit in a path of light, while the negro was in the dark.

In passing, it may be remarked how strange it is that, if the yard was so inadequately lighted, the plaintiff could locate a negro, in the shadow, with such distinctness of identification as to land him for a term in the state penitentiary.

My conception of the law of proximate cause is this:

It is important, in determining whether a given act was the proximate cause of the injury complained of, to observe the two classes in which the question arises; those in which the injury is the immediate result of the prime act, and those in which the injury is not the immediate result of the prime act, *but is the immediate result of an intervening act.* In the first class, it is ordinarily conclusive, if the injury is the immediate result of the act. On the other hand, the fact that an injury has resulted immediately from an intervening act, and not im-mediately from the prime act, is not necessarily conclusive of the question in favor of the defendant; for *the intervening cause may itself* have been the immediate result of the prime act, a result naturally to be expected or foreseen, probable to have happened in the natural course of events, and, therefore, the proximate result. So that the test of the proximate char-acter of the prime act as a cause, whether in reference to the injury, which has followed immediately from it, or in refer-ence to the intervening cause which itself has immediately produced the injury, is whether naturally, in the ordinary course of events, probably, in a manner which should have been foreseen or anticipated, the prime act has produced the injury, if immediate, or the intervening cause, if not.

The leading case in this State upon the subject is *Harri-son v. Berkley,* 1 Strob., 525, 47 Am. Dec., 578. There the

defendant sold liquor, in violation of a statute, to a slave.
The slave became intoxicated, lay out in the cold, and died
in consequence. The owner of the slave sued the seller of
the whisky for the death of the slave. The defendant con-
tended that his unlawful act in selling the liquor was not the
proximate cause of the death of the slave, and upon this
point much discussion was had. It was decided that the re-
sult of the defendant's illegal act was one naturally and rea-
sonably to be expected, and was not, therefore, too remote
from the prime cause. This is the crucial test of the question.
The Court concluded that it was but natural that the slave
should drink the whisky, that he should become intoxicated,
that he should be exposed to the very cold weather, and
should die. They say: "Where the mischievous purpose of
the slave is manifest, *or should be foreseen by ordinary pru-
dence,* the injurious act embraces the will of the slave, as one
of its ingredients; the wrong consists, in part, in ministering
to the purpose, *and the natural consequences* of that purpose
* * * are the legal consequences of the injurious act."

And again: "Thus, *without any unconnected influence* to
be perceived, the death has come from the intoxication,
which the defendant's act occasioned. The defendant cannot
complain that an agent [agency], which his own act natur-
ally brought into operation, has occurred to produce the re-
sult."

The Court further declared:

"*The connection is usually enfeebled, and the influence of
the injurious act controlled, where the wrongful act of a
third person intervenes, and where any new agent, intro-
duced by accident or design, becomes more powerful in pro-
ducing the consequence, than the first injurious act.* (8 East.,
1; 1 Esp., 48.) It is, therefore, required that the conse-
quences to be answered for, should be natural as well as
proximate. (7 Bing., 211; 5 B. & Ad., 645.) By this, I un-
derstand not that they should be such, as upon a calculation
of chances, would be found likely to occur, nor such as ex-

treme prudence might anticipate, but only, that they should be such, as have actually ensued one from another, *without the occurrence of any such extraordinary conjuncture of circumstances, or the intervention of any such extraordinary result, as that the usual course of nature should seem to have been departed from.* In requiring concurring consequences, that they should be proximate and natural to constitute legal damage, it seems that in proportion as one quality is strong, may the other be dispensed with; that which is immediate cannot be considered unnatural; *that which is reasonably to be expected* will be regarded, although it may be considerably removed."

In *Felder v. R. Co.*, 2 McMul., 403, a slave lay down on a track, which was foul with high grass and weeds, and was run over. The plaintiff alleged negligence in allowing the track to be in such a condition that the engineer could not see the slave in time to stop. The Court held that the alleged negligence was not the proximate cause of the death, but the intervening act of the slave was.

The Court says: "There are two causes which have contributed to this result. The first is the grass being so high as in some measure to obstruct the view of the engineer, and thereby preventing him from guarding against accidents as effectually as he otherwise might have done; and the second, that of the boy voluntarily and with reckless imprudence placing himself in danger, so as to bring upon himself the catastrophe. The one was a remote source of danger and could not be regarded as a proximate or necessary cause of the accident. * * * It would be to make the company not only liable for its own negligence, *but for injuries arising from the fault and imprudence of others, and they strangers, too, in nowise connected with the employment of the company.*"

In *Richardson v. R. Co.*, 8 Rich., 120, a slave lay down on the track and was run over. The plaintiff alleged negligence in having a board fence near the cattle guard, which obstructed the view and prevented the engineer from seeing

the slave in time to stop. The Court held that the alleged negligence was not the proximate cause of the death, but the intervening act of the slave was.

In *State v. Rankin,* 3 S. C., 450, 16 Am. Rep., 737, the Court said:

"The mere erection of the mill and dam on his own land was no nuisance; and if results, though injurious, yet not proximate and direct, followed, *because set in motion by the acts of others,* either in cutting the ditch, which, by the accumulation of sand, choked the channel and raised it higher than the adjacent banks, thus forcing the water over the edges of the ditch or banks and collecting it in pools or holes, or from the increased cultivation in the neighborhood, it would seem that the consequences are to be referred to an agency operating on the property of the defendant, for which he should not be liable, because not employed by him. They were not proximate or direct, in the legal sense in which those terms are understood. He must be held accountable for the unlawful effects which naturally or directly proceeded from his acts."

In *Hill v. R. Co.,* 31 S. C., 398, 10 S. E., 93, 5 L. R. A., 349, the Court said:

"In civil cases, a defendant is not responsible for results, except such as are natural, proximate, and direct. If such consequences are *caused by the acts of others, so operating on his acts as to produce the injurious consequences,* then he is not liable."

In *Cooper v. Richland County,* 76 S. C., 202, 56 S. E., 958, 10 L. R. A. (N. S.), 799, 121 Am. St. Rep., 946, the Court discusses quite fully and clearly the doctrine of proximate cause. That discussion arose upon appeal from an order sustaining a demurrer to the complaint, which alleged that the plaintiff's horse got caught by the foot in a defective bridge; that, in attempting to extricate him, the plaintiff was injured by the horse. The Court overruled the order sustaining the demurrer upon the ground that "the act of the plain-

tiff was such as might reasonably and naturally have been expected from a man of ordinary prudence, actuated by a commendable desire to relieve an animal from an extremely dangerous position," and said:

"What in law is a proximate cause is well expressed in the definition found in the case of *R. R. Co. v. Kellogg,* 94 U. S., 469, 474 [24 L. Ed., 256]: 'The primary cause may be the proximate cause of a disaster, though it operates through successive instruments as an article at the end of a chain may be moved by force applied to the other end, that force being the proximate cause of the movement, or, as in the oft-cited case of the squib thrown in the market-place. *Acott v. Shepherd,* 2 W. Bl., 892. The question always is, was there any unbroken connection between the wrongful act and the injury, a continuous operation? Did the facts constitute a succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury?' This definition is quoted with approval in *Mack v. R. R.,* 52 S. C., 324, 29 S. E., 905, 40 L. R. A., 679 [68 Am. St. Rep., 913]. This Court there says: 'There may be a succession of intermediate causes, each produced by the one preceding, and producing the one following. It must appear that the injury was the natural consequence of the wrongful act or omission. The new, independent, intervening cause must be one not produced by the wrongful act or omission, but independent of it, and adequate to bring the injurious results.' "

In *James v. Fountain Inn Mfg. Co.,* 80 S. C., 232, 61 S. E., 391, the Court said:

"The evidence tended to show that the machinery was in a defective condition as the result of defendant's negligence; that it was usual when the hook failed to pick up the dash-pot for the operator, instead of stopping the machinery, to press his hand on the spring of the hook so that it would catch on to the rod or arm of the dash-pot, and that the operator was expected to do this. The placing of his hand on

the machinery while in motion was the *probable and natural result to be anticipated* from the defective condition of the machinery, and the order to remedy the defect in the usual way without stopping the machinery. The slipping of the hand so as to be caught in the machinery was not the result of some intervening force or agency, but was the result of the pressure of the plaintiff's hand upon the moving hook, *an act he was expected and required to do."* ·

In *Martin v. R. Co.,* 77 S. C., 370, 58 S. E., 3, 122 Am. St. Rep., 574, the Court said:

"If there be an intervening cause and the prior cause do nothing more than give rise to the circumstances under which the injury occurs, then such prior cause cannot be said to be the proximate cause." See, also, *Foster v. City of Union,* 129 S. C., 257, 123 S. E., 839; *Carter v. R. Co.,* 109 S. C., 119, 95 S. E., 357, 11 A. L. R., 1411; *State v. Deschamps,* 126 S. C., 420, 120 S. E., 491; *Miller v. R. Co.,* 140 S. C., 162, 138 S. E., 675.

The Federal decisions, which are the final test in this particular case being one under the Employers' Liability Act, are equally strong in support of the rule announced by our own decisions.

In *Milwaukee & St. P. R. Co. v. Kellogg,* 94 U. S., 469, 24 L. Ed., 256, the Court said:

"The question always is, was there an unbroken connection between the wrongful act and the injury, a continuous operation? Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? It is admitted that the rule is difficult of application. But it is generally held that, in order to warrant a finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attend-

ing circumstances. These circumstances, in a case like the present, are the strength and direction of the wind, the combustible character of the elevator, its great height, and the proximity and combustible nature of the sawmill and the piles of lumber. Most of these circumstances were. ignored in the request for instruction .to the jury. Yet it is obvious that the immediate and inseparable consequences of negligently firing the elevator would have been very different if the wind had been less, if the elevator had been a low building constructed of stone, if the season had been wet, or if the lumber and the mill had been less combustible. And the defendants might well have anticipated or regarded the probable consequences of their negligence as much more far reaching than would have been natural or probable in other circumstances. We do not say that even the natural and probable consequences of a wrongful act or omission are in all cases to be chargeable to the misfeasance or nonfeasance. They are not when there is a sufficient and independent cause operating between the wrong and the injury. In such a case the resort of the sufferer must be to the originator of the intermediate cause. But when there is no intermediate efficient cause, the original wrong must be considered as reaching to the effect, and proximate to it. The inquiry must, therefore, always be whether there was any intermediate cause disconnected from the primary fault, ·and self-operating, which produced the injury. Here lies the difficulty. But the inquiry must be answered in accordance with common understanding. In a succession of independent events an interval may always be seen by an acute mind between a cause and its effect, though it may be so imperceptible as to be overlooked by a common mind. Thus, if a building be set on fire by negligence, and an adjoining building be destroyed without any negligence of the occupants of the first, no one would doubt that the destruction of the second was due to the negligence that caused the burning of the first. Yet, in truth, in a very legitimate sense, the immediate cause of the burning

of the second was the burning of the first. The same might be said of the burning of the furniture in the first. Such refinements are too minute for rules of social conduct. In the nature of things, there is in every transaction a succession of events, more or less dependent upon those preceding, and it is the province of a jury to look at this succession of events or facts, and ascertain whether they are naturally and probably connected with each other by a continuous sequence or are dissevered by new and independent agencies, and this must be determined in view of the circumstances existing at the time."

In *Washington & G. R. Co. v. Hickey,* 166 U. S., 521, 17 S. Ct., 661, 41 L. Ed., 1101:

"The suicide of Scheffer was not a result naturally and reasonably to be expected from the injury received on the train. It was not the natural and probable consequence, and could not have been foreseen in the light of the circumstances attending the negligence of the officers in charge of the train."

"His insanity, as a cause of his final destruction, was as little the natural or probable result of the negligence of the railway officials as his suicide, and each of these are casual or unexpected causes, intervening between the act which injured him and his death."

In *Chicago, St. P., M. & O. R. Co. v. Elliott* (C. C. A.), 55 F., 952, 20 L. R. A., 582:

"An injury that is the natural and probable consequence of an act of negligence is actionable. But an injury that could not have been foreseen or reasonably anticipated as the probable result of the negligence is not actionable, nor is an injury that is not the natural consequence of the negligence complained of, and would not have resulted from it, but for the interposition of some new, independent cause, that could not have been anticipated."

In *St. Louis & S. F. R. Co. v. Bennett* (C. C. A.), 69 F., 525: An injury that is natural and probable consequence of

acts of negligence is actionable; "but an injury that could not have been foreseen nor reasonably anticipated as the probable result of an act of negligence, is not actionable."

The intervention of the independent act of a third person between the wrong complained of and the injury, which act was the immediate cause of the injury, has been made a test of that remoteness of damages which forbids recovery. *Louisiana Mut. Ins. Co. v. Tweed*, 7 Wall., 44, 19 L. Ed., 65.

In The Paunpeck (C. C. A.), 86 F., 924:

"No liability attaches to an act of negligence for a result which could not have been foreseen, or reasonably anticipated as the probable consequence, and would not have been induced but for the interposition of a new and independent cause."

In *St. Louis-San Francisco R. Co. v. Mills*, 271 U. S., 344, 46 S. Ct., 520, 70 L. Ed., 979, the railroad company furnished a single guard to protect a strike breaker as he returned home. He was slain by strikers who boarded the street car in which the strike breaker and the guard were riding. The negligence alleged was in not supplying sufficient protection. The Court, reversing a judgment of the C. C. A. in favor of the plaintiff said:

"There is a similar absence of evidence of negligent failure by petitioners to fulfil this supposed duty of protection. The burden of proving negligence rested on the respondent. * * * But whether a supply of guards sufficient to meet an emergency was obtainable, what demands were made upon them, and whether there were other guards available for the particular journey when the decedent was killed, are questions on which the record is silent.

"Nor is there evidence from which the jury might infer that petitioner's failure to provide an additional guard or guards was the proximate cause of decedent's death.

Whether one or more additional guards would have pre-vented the killing is in the highest degree speculative."

So in the case at bar there is a like absence of evidence upon these material points. How many more lights and policemen should there have been, and, if there had been 100, would the shooting have been prevented? The more police-men there might have been in the yard, the more likely would have been the determination of the robbers to shoot instead of running and hiding.

To the same effect are *New Orleans & N. E. R. Co. v. Coogan*, 271 U. S., 472, 46 S. Ct., 564, 70 L. Ed., 1041; The Lusitania (D. C.), 251 F., 715; *Orton v. R. Co.* (C. C. A.), 7 F. (2d), 37; *Atlantic, etc., R. Co. v. Southwell*, 275 U. S., 64, 48 S. Ct., 25, 72 L. Ed., 157; *The Santa Rita* (C. C. A.), 176 F., 890, 30 L. R. A. (N. S.), 1210; *Wellington v. Pelletier* (C. C. A.), 173 F., 911, 26 L. R. A. (N. S.), 719; *American Bridge Co. v. Seeds* (C. C. A.), 144 F., 605, 11 L. R. A. (N. S.), 1041; *Goodlander Mill Co. v. Oil Co.* (C. C. A.), 63 F., 400, 27 L. R. A., 583; *Chicago, St. P., M. & O. R. Co. v. Elliott* (C. C. A.), 55 F., 949, 20 L. R. A., 582; *Cole v. German Savings & Loan Soc.* (C. C. A.), 124 F., 113, 63 L. R. A., 416; *Jennings v. Davis* (C. C. A.), 187 F., 703; *Texas & Pac. R. Co. v. Stewart*, 228 U. S., 357, 33 S. Ct., 548, 57 L. Ed., 875.

The text-books are equally unanimous upon the proposi-tion: 17 C. J., 734, 715, 750; Watson, Pers. Inj., § 58; 1 La Batt (1st Ed.) § 129, (2d Ed.) § 1570; 29 Cyc., 499; 21 A. & E. Enc. L., 494; Wharton, Neg. (2d Ed.) §§ 134, 138.

The State decisions are equally so: *Burt v. Advertiser Newspaper Co.*, 154 Mass., 238, 28 N. E., 1, 13 L. R. A., 97; *East Tennessee, V. & G. R. Co. v. Lockhart*, 79 Ala., 315; *Cuff v. R. Co.*, 35 N. J. Law, 17, 10 Am. Rep., 205; *Mahogany v. Ward*, 16 R. I., 479, 17 A., 860, 27 Am. St. Rep., 753; *Clark v. Wilmington & W. R. Co.*, 109 N. C., 430, 14 S. E., 43, 14 L. R. A., 749; *Lane v. Atlantic Works*, 111 Mass., 139; *Southern R. Co. v. Webb*, 116 Ga., 152, 42

S. E., 395, 59 L. R. A., 109; *Stone v. R. Co.*, 171 Mass.,
536, 51 N. E., 1, 41 L. R. A., 794; *Louisville Home Tel. Co.
v. Gasper,* 123 Ky., 128, 93 S. W., 1057, 9 L. R. A. (N. S.),
548; *Andrews v. Kinsel,* 114 Ga., 390, 40 S. E., 300, 88 Am.
St. Rep., 25; *Claypoole v. Wigmore,* 34 Ind. App., 35, 71
N. E., 509; *Edgar v. R. Co.,* 32 Utah, 330, 90 P., 745, 11
L. R. A. (N. S.), 738, 125 Am. St. Rep., 867; *Haynes v. R.
Co.,* 143 N. C., 154, 55 S. E., 516, 9 L. R. A. (N. S.), 972;
*Williams v. Iron Co.,* 106 Ala., 254, 17 So., 517; *Glassey v.
R. Co.,* 185 Mass., 315, 70 N. E., 199; *Nickey v. Steuder,*
164 Ind., 189, 73 N. E., 117; *Leeds v. Tel. Co.,* 178 N. Y.,
118, 70 N. E., 219; *Missouri. Pac. R. Co. v. Columbia,* 65
Kan., 390, 69 P., 338, 58 L. R. A., 399; *Texas & N. O. R.
Co. v. Murray,* 63 Tex. Civ. App., 340, 132 S. W., 496;
*Smith v. R. Co.,* 145 N. C., 98, 58 S. E., 799, 122 Am. St.
Rep., 423; *Brubaker v. Light Co.,* 130 Mo. App., 439, 110
S. W., 12; *Ultima Thule, etc., R. Co. v. Benton,* 86 Ark.,
289, 110 S. W., 1037; *Houston & T. C. R. Co. v. Gerald,*
60 Tex. Civ. App., 151, 128 S. W., 167; *Brown v. American
Co.,* 43 Ind. App., 560, 88 N. E., 81; *Tobler v. Pioneer Co.,*
166 Ala., 482, 52 So., 95; *Lyons v. Watt,* 43 Colo., 238, 95
P., 950; *Louisville & N. R. Co. v. Keiffer,* 132 Ky., 419,
113 S. W., 433; *Seith v. Elec. Co.,* 241 Ill., 252, 89 N. E.,
425, 24 L. R. A. (N. S.), 978, 132 Am. St. Rep., 204;
*Lewis, Adm'r, v. Taylor Coal Co.,* 112 Ky., 845, 66 S. W.,
1044, 57 L. R. A., 447; *Haney v. Coal Co.* (Tex. Civ.
App.), 207 S. W., 375; *Atlanta & W. P. R. Co. v. Reese,*
28 Ga. App., 275, 110 S. E., 750; *Saugerties Bank v. Delaware & Hudson Co.,* 236 N. Y., 425, 141 N. E., 904; *Louisville & N. R. Co. v. Daniels,* 135 Miss., 33, 99 So., 434, 34
A. L. R., 516; *Ragone v. State,* 123 Misc. Rep., 48, 204 N.
Y. S., 178; *Woodcock v. Hallock,* 98 Vt., 284, 127 A., 380;
*Shafer v. Keeley Co.,* 65 Utah, 46, 234 P., 300, 38 A. L. R.,
1523; *Fraser v. R. Co.,* 101 Kan., 122, 165 P., 831, L. R.
A., 1917-F, 749; *Franklin v. Elec. Co.* (Tex. Civ. App.),
286 S. W., 578; *Stephens v. Ry. Co.* (Okl.), 114 P., 611,
33 L. R. A. (N. S.), 1007.

## ORDER

MR. CHIEF JUSTICE WATTS: The mandate of the Supreme Court of the United States having been filed in the above-stated case, reversing the judgment of this Court and remanding the case thereto,

It is ordered that the above-stated case be remanded to the Court of Common Pleas for Spartanburg County, with direction to enter judgment in favor of the defendants under Rule 27 of this Court.